BENDER v. BENDER et al. (No. 7198.)*

(Court of Civil Appeals of Texas. Galveston. May 18, 1916. Rehearing Denied June 8, 1916.)

1. TRIAL ☞350(1) — SUBMITTING ISSUE TO JURY.

It is error to submit an issue not raised by the evidence.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 828; Dec. Dig. ☞350(1).]

2. NEW TRIAL ☞68—VERDICT CONTRARY TO EVIDENCE.

A verdict unsupported by evidence should be set aside on motion for new trial.

[Ed. Note.—For other cases, see New Trial, Cent. Dig. §§ 135–140; Dec. Dig. ☞68.]

3. VENDOR AND PURCHASER ☞44—VALIDITY OF CONTRACT.

In suit under Vernon's Sayles' Ann. Civ. St. 1914, art. 3518, allowing suit for specific performance of contract for sale of land made by deceased, to enforce a contract for sale of land by defendant's testatrix, evidence that she was of sound mind and understandingly canvassed the contract, which was not unfavorable to her, with several advisors and her lawyers, and that complainant did not urge her action, although it also appeared she was 70 years old and on friendly terms with complainant, *held* not sufficient to raise an issue of undue influence.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 69–76; Dec. Dig. ☞44.]

4. CONTRACTS ☞10(5) — VENDOR AND PURCHASER ☞13 — CONSIDERATION OF CONTRACT—MUTUALITY OF OBLIGATION.

An ordinary land sale contract providing for earnest money, examination of title, and conveying a good and merchantable title, or on failure to do so to return the earnest money, was not lacking consideration or mutuality.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 25; Dec. Dig. ☞10(5); Vendor and Purchaser, Cent. Dig. § 14; Dec. Dig. ☞13.]

5. SPECIFIC PERFORMANCE ☞117—PLEADING—VARIANCE.

Where the petition pleaded the contract, in which the description was in part erroneous but stated that the contract in this particular was incorrect because of clerical error, and correctly described the property, and the undisputed evidence supported these allegations, there was no fatal variance between the description in the contract and in the petition.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 377–381; Dec. Dig. ☞117.]

6. PLEADING ☞248(1) — AMENDMENT — NEW MATTER.

It was not intended by the rule allowing the filing of trial amendments that an amendment so filed might be made as a matter of right so as to include amendments setting up new causes of action or new defenses not pleaded or set up in some former plea, and which might cause a reopening of the case after proceeding to trial.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 686, 689–692; Dec. Dig. ☞248(1).]

7. PLEADING ☞245(3) — AMENDMENT—DURING TRIAL.

An amendment which would probably cause delay in a trial comes too late if offered after the parties have entered upon the trial.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 658, 659; Dec. Dig. ☞245(3).]

8. APPEAL AND ERROR ☞959(3)—REVIEW—DISCRETION—REFUSING AMENDMENT.

The discretion of the court in refusing an amendment offered after trial has begun which would probably cause delay in trial is not reviewable.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3830; Dec. Dig. ☞959(3).]

Error from District Court, Harris County; Chas. E. Ashe, Judge.

Suit by W. F. Bender against Louis Bender, in which Peter Borgstadt intervened and answered. Judgment for defendant and intervener in district court on appeal by intervener from judgment for plaintiff in county court, and plaintiff brings error. Reversed and rendered.

H. E. Stephenson and T. H. Stone, both of Houston, for plaintiff in error. D. E. Simmons and Jones & Jones, all of Houston, for defendants in error.

LANE, J. For the purposes of this opinion we make the following statement:

On the 26th day of November, 1913, Mrs. Mary Hafer, under her maiden name, Borgstadt, and appellant, W. F. Bender, entered into a written contract in words and figures as follows:

"State of Texas, County of Harris.

"This contract of bargain and sale made and entered into by and between Mrs. Mary Borgstadt, a feme sole, party of the first part, and W. F. Bender, party of the second part, both

residents of the city of Houston, Harris county, Tex., witnesseth:

"(1) That the party of the first part has this day bargained and sold, and by these presents does hereby bargain, sell, and obligate herself to convey, unto said party of the second part, or his assigns, subject to the conditions hereinafter named, all the following described property, to wit: Being a part of lot No. 11 in block No. 57, S. S. B. B., in the city of Houston, Harris county, Tex., fronting 45 feet on McKinney avenue, and running back between parallel lines 100, more or less, feet for depth, forming a rectangle, together with all improvements thereon, and being known and designated as No. 1816 McKinney avenue, and being generally known as the residence or homestead place of first party, upon which she has resided for about 40 years. First party is to have and retain the right to continue to use and occupy the premises herein sold, or contracted to be sold, for use as a homestead, without cost to her, so long as she may live, but the right reserved to use and occupy said premises by first party shall not be assignable, nor shall she sublet the same to any person, but shall have the right only to use and occupy same herself as a home until her death, whereupon all right to occupy the same by any person whomsoever except by, through, or under second party, shall terminate and cease. First party agrees to carry, at her own expense, insurance upon the improvements on said premises in the sum of one thousand dollars ($1,000.00) so long as she shall occupy the same and until her death, the policies of insurance to be payable to second party, but second party is to pay all taxes which may be levied or assessed against said property from and after the date of the conveyance of the said premises to second party, except that first party is to pay all taxes due thereon for the year 1913 and all back taxes, if any, which may be chargeable against said property and be unpaid at the date of the conveyance by first party to second party.

"(2) The consideration to be paid to first party by second party for the property and premises above described is the agreed sum of fifteen hundred dollars ($1,500.00) cash, to be paid as follows: One hundred dollars ($100.00) on the execution by first party and the delivery to second party of this contract of sale and conveyance, and the remaining fourteen hundred dollars ($1,400.00) to be paid within 60 days from the delivery of the complete abstract of title to said property for examination by second party, provided the title to said premises is a good and merchantable title as hereinafter provided.

"(3) First party agrees to deliver to second party at the earliest practicable date a complete abstract of title certified to date of delivery to the above-described property for examination, the said abstract of title to be paid for by party of second part. If upon examination the title as shown by the abstract is a good and merchantable title, then first party will make, execute, and tender to second party a good and sufficient deed conveying the aforesaid property to second party with covenants and general warranty clause in accordance with the terms and conditions of this contract.

"If the title to said property upon examination is found not to be a good and merchantable title, the defects therein shall be pointed out in writing by the attorney of second party, and first party shall have 60 days' time within which to cure said defects, or second party may have equal right to cure or remove said defects in said title at his own expense within 60 days after same are pointed out in writing by his said attorney. If the title is not good, and the defects are not cured by either first or second party within the time herein provided, then upon demand of second party first party agrees to return and repay the one hundred dollars

($100.00) in cash this day paid to first party as part payment upon the purchase price of the property herein sold to second party, and both parties shall, after said sum of one hundred dollars ($100.00) is repaid to second party, be released from all liability hereunder as to each other.

"If the title to said property is found to be a good and merchantable title, and second party does not within 60 days after delivery of abstract of title and upon a tender of a warranty deed in accordance with the terms and conditions of this contract by first party pay to the first party the remaining amount, namely, fourteen hundred dollars ($1,400.00) in cash due hereunder, then first party shall forfeit to herself and keep the said sum of one hundred dollars ($100.00) this day paid by second party, which both parties hereby agree shall be forfeited as liquidated damages in the event of failure of second party to carry out the conditions of this contract, and thereupon both parties hereto shall be released from all liability hereunder.

"In the event the improvements upon the property herein sold shall be destroyed by fire during the occupancy and before the death of first party, after conveyance thereof to second party the money received for insurance under any policies of insurance on said premises paid for by first party shall be promptly used and expended by second party, or his assigns, in the construction of a building upon said property which first party shall have the right to use and occupy as herein provided until her death.

"Witness our hands in duplicate at Houston, Tex., this the 26th day of November, A. D. 1913.                     Mary Borgstadt.
                                    "W. F. Bender.
"Witness: G. W. Tharp."

Said contract was duly acknowledged by both parties thereto. The abstract of title provided for by the contract was delivered to appellant, W. F. Bender, on the 8th day of January, 1914. Mrs. Mary Hafer died on the 14th day of January, 1914, six days after the delivery of said abstract to appellant, W. F. Bender. From the time the abstract was delivered to appellant, Bender, up to the time of the death of Mrs. Hafer, she (Mrs. Hafer) was too ill to attend to any kind of business. After the abstract of title had been delivered to appellant on the 8th day of January, 1914, and before the death of Mrs. Hafer, appellant concluded to accept a deed to the property described in the contract from Mrs. Hafer, and to pay the $1,400 balance of the purchase money due as stated in the contract, and, as Mrs. Hafer was too ill to transact any kind of business, appellant tendered said $1,400 to G. W. Tharp, Sr., Mrs. Hafer's attorney, before the death of Mrs. Hafer, who declined to accept same. Mrs. Hafer died without making a deed conveying said property to Bender.

At the March term of the county court of Harris county, 1914, Louis Bender was appointed and qualified as executor of the will of Mrs. Mary Hafer, deceased. Thereafter, on the 4th day of April, 1914, appellant, W. F. Bender, filed his complaint in writing in the county court of Harris county, under the provisions of article 3518, Vernon's Sayles' Statutes, praying for a decree of the county court directing a specific performance of said contract entered into between himself and Mrs. Hafer, deceased, and Louis

Bender, executor, was served with proper process. Peter Borgstadt intervened in said cause to contest the application or prayer of appellant, W. F. Bender, for specific performance.

Upon trial in the county court a decree was entered directing Louis Bender, executor, to execute a deed conveying said property to said W. F. Bender under the terms of said contract. From this judgment the intervener, Borgstadt, appealed to the district court of Harris county. In the district court W. F. Bender amended his petition, set up said contract, and, as before, prayed for a decree directing specific performance. On the 6th day of April, 1915, intervener, Peter Borgstadt, filed his third amended answer, upon which he went to trial. He alleges that he is the owner of the property involved in this suit under the provisions of the will of Mrs. Mary Hafer, deceased, which had been duly probated, and entitled to the possession of the same; that the contract the specific performance of which is here sought to be enforced was obtained by appellant, W. F. Bender, by reason of undue influence brought to bear on the mind of Mrs. Hafer by said Bender. He alleges that at the time said contract was issued Mrs. Hafer was 70 years of age, weak in body and mind; that she lived within a few feet of appellant, W. F. Bender, at the time said contract was executed and was his close and confidential neighbor, and had so lived for a great number of years; that she had great confidence in Bender, and that she frequently and habitually consulted and advised with him about her affairs; that said Bender by reason of the confidence and trust imposed in him by Mrs. Hafer overreached her and wrongfully persuaded and induced her to execute said contract, to her great injury, and to the great advantage of said W. F. Bender; that, as said contract was obtained by said Bender by the exercise of undue influence upon the mind of Mrs. Hafer, the same should be declared void; and that the prayer of Bender for specific performance should be denied.

Plaintiff by supplemental petition denied all the material matters in defendant's answer.

We deem the statement above made, as to the material allegations of intervener's petition sufficient, as the only issue the trial court submitted to the jury was: Was said contract obtained by W. F. Bender from Mrs. Hafer by the exercise of undue influence, as alleged by intervener?

The case was submitted to a jury upon the following issues:

(1) "Did Mrs. Hafer (née Borgstadt) execute the contract which is in evidence before you by reason of undue influence of W. F. Bender operating upon her mind at said time? Answer 'Yes' or 'No.'"

(2) "What was the reasonable market value of the premises in controversy in this suit on November 26 and 27, 1913? State the amount you find in dollars and cents."

187 S.W.—47

The jury answered the first question "yes," and the second that the value of said property at such time was $4,900. Upon the answers of the jury the trial court rendered judgment that plaintiff, W. F. Bender, take nothing by his suit, and that the defendant, Louis Bender, executor, and intervener, Peter Borgstadt, go hence without day, and that they recover their costs incurred herein against W. F. Bender. From such judgment W. F. Bender has appealed.

Practically the only question submitted by the trial court to the jury was as to whether or not the contract executed by Mrs. Hafer was obtained by appellant, W. F. Bender, by undue influence exercised upon or over the mind of the said Mrs. Hafer. Wherefore we think this is the principal, if not the sole, only, and controlling, question presented for our decision, and which, if answered in the negative, will dispose of all the issues presented in this cause.

[1, 2] If there was no evidence introduced to authorize the court to submit the question of undue influence to the jury, or, in other words, if the evidence was insufficient to raise that issue, the trial court should not have submitted the question to the jury for its verdict, and in the second instance the court should have set said verdict aside upon motion for new trial. To determine the foregoing question resort to such portions of the testimony of the various witnesses as bear upon this question must be had.

W. F. Bender, plaintiff in error, testified:

"Mr. T. H. Stone represented me in the preparation of said contract. I gave him full authority to represent me in said business. I signed said contract in Mr. Stone's office. I think Mrs. Borgstadt signed it in Mr. Tharp's office. Mr. G. W. Tharp and his son, Phillip Tharp, represented Mrs. Hafer in this matter. The contract is dated November 26, 1913. I think Mrs. Hafer and I were furnished duplicate copies of the contract between the 20th and 25th of November, 1913. Duplicate copies were furnished before the contract was signed up. I know that Mrs. Hafer had possession of a copy at her home before she signed it. I do not remember exactly what day I went to Mr. Stone's about the drawing up of this contract. I think it was about the 22d or 23d of November, 1913, something like that. Mrs. Hafer went up there with me at the time to see Mr. Stone. She had her attorney with her. She had her attorney called over after we got there. She wanted Mr. G. W. Tharp as her attorney but he was not in, and she said Mr. Phillip Tharp would do. My recollection is that this was about the 22d or 23d of November, 1913. That was the first time I had been up to Mr. Stone's office to see about the contract. I think it was the only time Mrs. Borgstadt was up there in Mr. Stone's office."

"I have transacted business next door to Mrs. Borgstadt since about 1906 myself, and my father was in business there probably 35 or 40 years before me. Mrs. Borgstadt was as healthy at the time she signed the contract as she ever was. She was 70 years old at the time of her death."

"I never did see the abstract that I procured. My attorneys had the abstract. I think I ordered it from Stewart Abstract & Title Company.

I ordered it about the latter part of December, 1913."

Phillip Tharp, witness for plaintiff in error, testified as follows:

"I am a son of Mr. G. W. Tharp. I knew Mrs. Mary Hafer during her lifetime. I was present when a contract between her and W. F. Bender was discussed in the latter part of 1913. Some one called from Mr. T. H. Stone's office that they wanted my father to come over, that Mrs. Hafer wanted him present, and he was out at the time, and so I went over."

Cross-examination:

"When I got over to Mr. Stone's office there was no contract drawn; that is, it was not in writing. The contract had apparently been agreed upon. The capacity in which I acted was to see that the contract was put in proper shape to carry out the terms as they had been agreed upon. I did not discuss in any way the advisability of the contract; that was not discussed. Mr. T. H. Stone dictated the contract."

W. G. Tharp, witness for plaintiff in error, testified as follows:

"With reference to whether or not I represented Mrs. Hafer in this transaction, I can explain just what I did. I was called up over the telephone by Mr. Stone, or somebody in his office, and was told that Mrs. Borgstadt was coming over to my office with a contract to submit to me about the date it was signed, and a few minutes later she came with a copy of the contract, and I was informed that she was making the contract, and she wanted me to read it to her and explain it to her, and I did so. A little later Mr. Stephenson came over, and Mrs. Borgstadt signed the contract in my office, in my presence, and in Mr. Stephenson's presence. There was no money paid there that I remember; I do not think there was. My son, Phillip, was with me at that time. I do not know whether I had taken him in as a partner at that time or not; I think I had. I think my son was present at the time the contract was signed, but I would not be positive. At that time I had known Mrs. Hafer, or Borgstadt, about five years. I had really known who she was for a great many years, but had never transacted business for her until about five years before that. I have no recollection of having heard anything about this particular transaction before that day. I do not think I had. It is possible that I had, but I do not remember it. At the time Mr. Stephenson got over to my office we had read the contract over, and I explained the provisions of it to Mrs. Hafer. It impressed itself somewhat on my mind, and I think I remember what took place while she was there. I read the contract to Mrs. Hafer. When we got down to the description it said '45 feet front on McKinney avenue and 102 feet in depth.' She remarked that she would not give a deed to 102 feet, or would not execute a contract to 102 feet, because she did not know whether she had it or not. She said that her deed called for 100 feet, and that is all she would contract for. I remember that. And after Mr. Stephenson came that question was raised, and he wrote in the contract '100 feet more or less'; scratched out the '2' in '102,' and wrote 'more or less.' That was to satisfy Mrs. Hafer. I explained to her that 'more or less' would not bind her to 100 feet, but it would give the party that was getting the property whatever it was; if it was less than 100 feet he had to take it, and if it was over he got it. Then the next question that was raised we got down to the third provision, and as written in the contract that was that she was to furnish an abstract of title. She said she would not do that. She said she had not agreed to do that, and she would not do it, because she had a good title; she had had over forty years' possession, and she would not give anybody an abstract, and

my recollection is she said that she never agreed to do it. So Mr. Stephenson wrote in with a pen: 'The said abstract to be paid for by party of second part.' That left her free from paying it. The other provisions of the contract she did not object to, and she did not ask me about the advisability of making it at all. She just simply asked me to read the contract and explain it to her, and that I did do. The only objections she made were where the interlineations were made as I have stated, and she did not ask me to raise objections to anything, and I did not. When Mrs. Hafer came to my office she brought with her either the copy of the contract now shown me or another one just like it. I do not think anybody came in the office with her."

H. E. Stephenson, witness for plaintiff in error, testified as follows:

"I want to state that after the execution of the original contract, and before the death of Mrs. Mary Hafer, I approached Mr. G. W. Tharp in his office in the city of Houston, and stated to him that Mr. T. H. Stone and myself had made an examination of the title to the land in question, and had decided in behalf of Mr. W. F. Bender to accept the title to the property and to pay the balance due, which was $1,400, and in answer to which Mr. Tharp stated that Mrs. Hafer had not spent all of the $100, but that he would take the matter up with her and get her up there to make the deed."

T. H. Stone, witness for plaintiff in error, testified:

"I prepared the contract in this case. At the time the contract was first discussed by me there was no one present except W. F. Bender, whom I represented, and Mrs. Hafer, or Mrs. Borgstadt; she was addressed interchangeably, I think, by both names. My recollection is we had two conferences in my office. As I recall it now, I believe, both of these conferences occurred the same day, or one ran into the other, perhaps; I think that is it. Mrs. Hafer and Mr. Bender came into my office and submitted a statement to me of the contract as they agreed upon it, and I discussed it with them until I understood it thoroughly, and they both seemed to understand it thoroughly. As I now recall, I asked Mrs. Hafer who represented her, if she had any attorney, and my present recollection is that after she had told me that Messrs. Tharp & Tharp represented her we rang them up, and my recollection is that at the first time Mr. G. W. Tharp was not in his office, and that his son came over. I am not so clear about which one came over, but I know that one of them came over, and I think—in fact, I am quite sure—was present when I dictated the contract, after we had gone over the entire transaction. Then, after the contract was written out, and I think the next day—I am quite sure the next day—Mr. Stephenson took the contract as prepared and went over to Mr. Tharp's office with it, and rang me up from there about their refusing to pay for the abstract of title, and talked to me about it, and I finally suggested that we waive that and go ahead and pay for the abstract of title. Mrs. Hafer was present and heard all this. I was not in Mr. Tharp's office. This last conversation between Mr. Stephenson and Mr. Tharp and Mrs. Hafer was not in my office; it was in Mr. Tharp's office I was in my office. Mrs. Hafer was present in my office, and heard the whole conversation we had there, and stated to me that Mr. Tharp had represented her for years, and that he would represent her in this matter, and she would sign no contract which he did not approve, and I therefore asked that she get her attorney over there."

L. G. Bender, witness for plaintiff in error, testified on redirect examination:

"During 30 or 40 years I saw Mrs. Hafer every day. She would be over at my shop every

day. I would not call her an educated woman, but she was a woman of good common sense, and especially had lots of sense for her own interests."

"As to Mrs. Hafer's mental condition on or about November 26, 1913, I think her mental condition was the same always, one time like another. She was hurt the year previous to her death, but that never affected her mind a particle. She was hurt in the hip and back somewhere, she was always telling me, but she was always the same. During the time I have mentioned I never noticed anything peculiar or out of the ordinary in Mrs. Hafer's acts and conduct."

Mrs. Henry Harris testified in behalf of plaintiff in error as follows:

"I reside at 117 Chartres street, Houston, and have resided at that place for about 27 years. I knew Mrs. Mary Hafer about 27 years, and I knew of her all of my life. * * * I knew her right up to her death. There was not any change in our social relations at any time before Mrs. Hafer's death; we were on the best of terms and friends."

"During my acquaintance and association with Mrs. Hafer I had occasion to talk and converse with her about different things. I never did notice any indication of insanity or weakness of mind. She was the same to me always, like when I first got acquainted with her. She spoke mostly English with me, and sometimes German, just as we felt like. We both spoke German. On or about November 26, 1913, her mind was in a normal, ordinary condition, certainly, in my opinion."

On cross-examination she further testified:

"By a normal mind I mean just like my mind would be. She had just as good and sound a mind the last day I talked to her as she always had ever since I had been acquainted with her. She had a very bright mind, a very sensible woman. I considered her a very bright and very sensible woman. I was not present when Mrs. Hafer signed any agreement with Mr. Bender. I read said contract over. She brought it to my house and I read it over, and I told her it was a very good proposition. She brought it to my house because she was this kind of a woman that she would go around and let different people give her advice, I suppose, or wanted different people to know about her transactions, whatever she made. She always liked to get somebody's suggestions. She confided, placed confidence in people, I think. I do not think she wanted my advice; she had a kind of a mind of her own that way, but she would like to tell people about it. The way the contract read it sounded to me like it was a good one. I did not know what the property she was selling there was worth. I did not know how long she was going to live either. * * * If I was just a single person in the world, and a proposition like that should be put before me I believe I would accept it."

On redirect examination she further testified:

"I saw that contract. She brought it over there and she let me read it. I do not remember whether she had her signature on it at that time. I don't remember that, but she let me read it, and I told her, I said, 'Well, Mrs. Hafer, if everything is like it says here, that's a pretty good proposition.' She says, 'Yes; I think so myself.' So, of course, I just left it with her. She seemed to understand the contract thoroughly. She did not express any dissatisfaction with it; she was perfectly willing, and she told me she wanted Mr. Bender to have the property of hers; she said she wanted no one else but Mr. Bender to have it."

C. L. Fitch, witness for plaintiff in error, testified as follows:

"I reside at 1906 McKinney avenue, on the corner of McKinney and Hamilton, in the city of Houston. I am engaged in the real estate business. I have resided out there on McKinney avenue some 16 or 17 years. I should imagine my residence from the front door would be about half a block from Mrs. Hafer's. I knew her during her lifetime. As to the extent of our social relations, she would call around to the house very frequently, and particularly so when she had any business; she generally advised with me when she had any business. During that length of time I saw her often, and on every time I passed her house I would stop and chat with her. She had some flowers, and I was very fond of those and chat with her. That relation continued up to her death. I know about the contract that was executed by Mrs. Hafer to Mr. W. F. Bender. I read it. She brought it over to the house before it was executed. It hadn't been executed when I read it. I remember that. . I don't remember the time, but she brought it over there for the purpose of my reading it over and advising her. I read it over and explained it to her. She seemed to understand it thoroughly and knew what she was doing. She did not at any time ever indicate a weakness or unsoundness of mind, and defect in mind or memory. Miss Mary, from the time I knew her up to the time she died, I think she was practically the same; she had a good mind so far as I was able to judge."

"I cannot state what time she brought me that contract, only she told me she hadn't turned it over to to Mr. Bender yet. She brought it over for me to read and explain to her. I don't think any signatures were attached to it at all at that time. She only brought one copy to me. I never saw it afterwards; I don't know whether she signed that contract or not. When she brought it to me, she wanted me to read it over and see what I thought about the trade she was making, and I read the contract over, and I impressed upon her mind that she was deeding that property away to Willie Bender when she did. I said, 'If that's your intention, that's in the contract, but you understand when you deed that that property is going over to Mr. Willie Bender.' She says, 'Well, I want Willie Bender to have it.'"

On redirect examination this witness testified as follows:

"As near as I can read the contract handed me, that looks like practically the same one that she brought over to the house; it read just that way; that was the way it read. I don't know whether this was the one or not. This is practically the same; the reading of it is the same. I can't recall any new clause in this that wasn't in the other. I can't recall anything that's left out of this; just as I remember it."

A. J. Harris, witness for plaintiff in error, testified:

"I live at 1117 Chartres street, corner Dallas. I have resided there 26 or 27 years. I think my residence is about three blocks from Mrs. Hafer's residence. I have known her for 45 years. During that time I have seen her every once in a while. That continued on up to about, say, a week before her death. I haven't seen anything different in her actions regarding her mind from the time I first knew her until a week before she died, during that entire time. My opinion is that her mind was sound at the time of her death."

On cross-examination this witness testified:

"My wife was on the stand this morning. I married Miss Kolbow. My wife is not related to Mr. Bender. Mrs. Hafer came over to my house every once in a while, sometimes once a

week, about on an average once a week. She brought the contract around to my house, and I read it. She met me on the street, and I read it on the street at her request, before I got home with her; then I read it again at my house. I met her across the street in front of Mr. ――――, near home. She was coming from town. She pulled it out on the street and let me read it. Afterwards she came on home with it. I believe it was that night she came to my house. I don't know of anybody else that read it for her; I couldn't say positively, only what I heard. I have heard of another party reading it—Mr. Fitch. I didn't hear him testify a while ago that he had read it. When I read it over I told her that she was making a very cheap bargain, and that if she wanted to I would fulfill it, every part of it, and give her $1,000 more, and she said there wasn't any use talking to her about giving her any amount of money for it; that she wanted Mr. Bender to have the property. I don't know exactly why; she just said she wanted him to have it. She seemed to be friendly with Mr. Bender. I actually offered to give her $1,000 more than was given her, but she wouldn't take it. That was before the contract was signed, before she told me she was going to make the contract. She told me what Mr. Bender had offered her. Then I made her this offer, and she wouldn't accept it."

Herman Schneider, witness for plaintiff in error, testified:

"I reside at 1904 McKinney avenue. That is 200 feet from where Mrs. Mary Hafer resided last. I have resided there about 24 years. I knew her during her lifetime. I expect I saw her four or five times a week, probably every day. I have had occasion to discuss different matters with her from time to time. * * * I couldn't say as to the date, but as long as I have known her I always considered her to be sound in mind. I knew her up to her death."

Mrs. Mary Schmidt, witness for plaintiff in error, testified:

"I reside at 1118 Hamilton. That is two blocks from where Mrs. Mary Hafer resided during her lifetime. I have resided there 31 years the 23d day of this month (April, 1915). I met Mrs. Hafer just 2 years before I got married. I got married on the 23d day of April, 1884, I believe it was. I don't know how often I saw her during that time; sometimes I saw her every day for a week or so; then again sometimes I wouldn't see her for two or three weeks. That continued up to her death. I saw her in the later years more than I did in the first years. I had occasion to converse with her about various matters from time to time; we spoke matters over, you know. Lots of times I told her not to take my advice; to go to Mr. Schneider; to go to Mr. Bender lots of times. She came to her neighbors with her troubles, you know. * * * I never noticed during the time I have known her any weakness in her mind or memory. She was always of a sound mind. I always thought she had a very good memory. In my opinion, her age had no effect at all upon her mind or memory; I never noticed any flaw of any kind. I did not know anything about a contract she executed with Mr. W. F. Bender until after it was over with, but I had oftentimes joshed with her and said, 'Mrs. Hafer, I reckon Mr. Bender will fall heir to your estate.' She said, 'Well, Mr. Bender is mighty good to me.' That is all I know about it. At the time it happened I was away from home. Mr. Bender has always done more for her than anybody else's son; he has been her daily companion."

"I attended the funeral of Mrs. Hafer. Mr. Bender attended to the duties of arrangements of the details. Afterwards her cousin came. I don't know anything about it, but Mr. Bender was the person that took it in charge. That was Mr. Will Bender. In her sickness, from time to time, or needs through the year, he attended to her wants. He was her daily companion and knew from time to time whether she was sick or whether she was well, because his butcher shop was right next door; all she had to do was to call out of the window and she could call him."

It was also shown by the undisputed evidence that Mrs. Hafer (née Borgstadt) became very ill on the 7th of January, 1914, and remained so until she died on the 14th of said month, without having conveyed the premises in question to W. F. Bender; that the abstract provided for under the contract was delivered to said Bender on the 8th day of January, and that in a very few days thereafter, and before Mrs. Hafer died, he agreed to accept a conveyance to said property, and so expressed his intention to G. W. Tharp, Sr., who Mrs. Hafer had informed him was her lawyer, and offered to pay said Tharp the balance of the purchase money named in the contract, and that, owing to the serious illness of Mrs. Hafer, it was impossible for him to make such tender to her at that time; that the property described in the contract was situated in Houston, Tex., at No. 1816 McKinney avenue, and was at the time said contract was made, and had been for 30 or 40 years, the home of Mrs. Hafer, that said property was worth about $4,000 to $4,900 at the time of the execution of said contract.

Intervener, Peter Borgstadt, testified as follows:

"The first time I talked with Mrs. Hafer about selling the place she did not show me any written agreement. She had not signed it then. She said she sold her place for $1,500, and she could stay there and live. That was before she had the contract in the house; I do not know whether she had it written; I was at her house. At that time she told me she wanted to sell it, and after I got there again she done sold it already, the second time. I do not remember when I was there the second time; it was about a week after, or something like that. Mrs. Hafer showed me the contract then. I think I would know the contract if I were to see it. The paper now shown me is the contract. Mrs. Hafer showed me the contract, and I read it over. It was already signed at that time when I saw it."

"I do not recollect the day at all that I last talked to Mrs. Hafer before November 26, 1913. I had some conversation with her in November, 1913. In the conversation in November, 1913, we talked about her selling her place. I do not know particularly how long the conversation lasted; it lasted a good while. The day I was in there we would be together maybe an hour, or half an hour, something that way. The first time she told me she wanted to sell her place to Mr. Bender, and the next time we had the contract. She took the contract out of her desk and showed it to me. I did not see the contract any more before she died. After Mrs. Hafer died I found the contract in her desk, where she took it out the first time to show it to me. The desk was in her little room where she always had been sleeping. I also found her will there. I took the contract home, and Mr. Tharp took the will and brought it to the courthouse. Sometimes Mrs. Hafer spoke about her business affairs to me. She talked lots of that money that she lost back there—that was something that bothered her

a heap—to Lyons, or whatever his name was. That was at the time I talked to her before November, 1913. That is what she had been talking about, about what she had loaned out at that time to Lyons, and talked about Bollfrass, and everything. She said she was afraid always she would lose that. That is the most we talked about that I can remember much of in 1912. During 1913 selling her place was the most that we talked about. At the first time I went over there she told me she sold the place to Mr. Bender, and he would support her, and they would live together. She told me then she wanted to sell the place to Mr. Bender, and he would stay and live with her and build up the house better yet, and he would give her all she wanted to eat, and buy her a hat once in a while; that is all she would need. She would not live on her money. She did not have the contract yet. The next time she came in she had the contract there. Before I saw the contract Mrs. Hafer had been telling me how she sold the place; that Mr. Bender would support her and live with her. That is what she told me just before I saw the contract. I cannot remember everything she said. Mrs. Hafer did not do anything for a living. I do not know any reason why she did not have an occupation or business except she was too old to do anything. I have no objection to telling all I know about this case, but what I do not know I cannot tell. I have stated I had these conversations with Mrs. Hafer almost every week, when I would come in to town. From those conversations and discussions I had with Mrs. Hafer I reached a conclusion as to whether her mind was a strong mind or a weak mind. When she sold the place she told us Bender would attend to her and support her, and he 'would live with her, and he was going to make a two-story house out of it; and later on she said that she had to live by herself, anyhow; that she done sold it. It looked to me like she did not know; looked like she did not have a good mind. I cannot remember everything that Mrs. Hafer spoke, it is so long, over a 'year now. I just cannot recall those things Mrs. Hafer said that caused me to form those opinions I had; I did not think I had to remember them. I think we have all now that I know about this case that I can remember. Maybe I can remember later on yet, if I think about it."

Mrs. Peter Borgstadt testified that Mrs. Hafer was weak in mind, and was for a whole year, and that she had not been strong for a whole year just prior to her death, and that she, Mrs. Borgstadt, and her husband, read and explained the contract to Mrs. Hafer after it had been signed.

Mrs. Meincher, for intervener, testified that Mrs. Hafer was weak-minded; that she came to her house with her dress on hind part in front and insisted that that was the way it belonged; that she lost her way in returning to her home; and that she accompanied her back to her home.

Rev. Mr. Dycke, for intervener, testified that Mrs. Hafer was more feeble after she got injured by a fall than she had been prior thereto; that he noticed that she was absent-minded for some time; that she would sometimes mumble to herself, talk to herself; that she brought the contract to him and he read and translated it into German and explained it to her.

There is neither allegation nor evidence that Mrs. Hafer was laboring under such mental incapacity as rendered her incapable of disposing of her property by deed, or that any misrepresentations or other fraud was practiced upon her by W. F. Bender, or any one for him, to procure the execution of the contract in question, but intervener's defense is based upon the theory that W. F. Bender procured the execution of said contract by undue influence. In support of such theory he offered evidence tending to support three propositions: (1) That Mrs. Hafer was 70 years of age, weak and feeble in body and mind, at the time said contract was executed; (2) that plaintiff, W. F. Bender, was a close neighbor of Mrs. Hafer's, and one in whom she had great confidence, and with whom she frequently consulted and advised about her affairs, and that he was in such position and bore such friendly relations to Mrs. Hafer that he could have wrongfully overreached and induced her to execute a contract against her interest and to his advantage; (3) that the consideration to be paid by plaintiff, W. F. Bender, for the property in question under the terms of said contract was much less than the value of said property; and (4) that the evidence tending to prove the three foregoing propositions was sufficient evidence to authorize and require the trial court to submit the question as to whether or not W. F. Bender procured the contract in question by means of undue influence, to the jury.

[3] We do not think the evidence is sufficient to show such weakness of mind on the part of the deceased as to render her easily susceptible of undue influence. The mere fact that appellant was her neighbor and friend in whom she placed confidence and trust, and that he had the opportunity to use undue influence upon her to induce her to make the contract, cannot, in the face of the undisputed evidence that she relied upon and consulted her other friends and her attorney before making it, and that appellant did nothing to urge or induce her to make it, be held sufficient to raise the issue of undue influence. In so far as the inadequacy of the consideration is concerned, we think the evidence fails to show such inadequacy. Such consideration was $1,500 cash, and the payment of all future taxes, and to permit Mrs. Hafer to use such property as her home as long as she might live. No one could know how long Mrs. Hafer could live. She might have lived 10, 15, or even 20 years longer, and in such case W. F. Bender would have had the $1,500, and the amount paid for taxes and general repairs on the property, invested for such time without interest or revenue of any kind arising therefrom. It is apparent that conditions might have arisen which would have made it a poor investment for Bender.

The only circumstance presented by the record which would have a bearing upon the question of undue influence is that plaintiff in error, W. F. Bender, had an opportunity to see and talk with Mrs. Hafer, deceased. There is no evidence that he took advantage

of this in any manner whatsoever. There is no fiduciary relation alleged or proved. The evidence shows that Mrs. Hafer expressed a desire prior to the execution of the contract in question, directly to Peter Borgstadt and his wife, to sell the place to W. F. Bender for the sum of $1,500. She was represented by counsel at the time the contract was agreed upon and dictated, and was furnished with a copy of same several days prior to its execution. She advised with several of her neighbors about the contract before she executed it, and was represented by counsel at the time same was signed by her.

The case of Barry v. Graciette, 71 S. W. 309, lays down the proposition that:

"Undue influence avoiding a will is not established by evidence of opportunity therefor and the fact that testatrix had some time before expressed an intention to make a different disposition of her property."

Judge Fly, in Salinas v. Garcia, 135 S. W. 588, in which case a writ of error was denied by the Supreme Court, states the following:

"'There is no presumption against a will because made by a man advanced in age. * * * Incapacity cannot be inferred from enfeebled condition of mind or body; for, if incapacity could be inferred from such facts, a man by mere inference might be deprived of his legal right to dispose of his property as he sees fit.' The evidence showed without contradiction that the will was read to the testatrix in Spanish, her mother tongue, and that she expressed approval of it and thoroughly understood it. Her inability to see and read the will under such circumstances would not invalidate it. It is stated in 1 Jarman on Wills, p. 63, that blindness or deafness alone would not incapacitate to make a will."

See, also, Patterson v. Lamb, 21 Tex. Civ. App. 512, 52 S. W. 98, in which a writ of error was denied by the Supreme Court. Helsey v. Moss, 52 Tex. Civ. App. 57, 113 S. W. 599; Simon v. Middleton, 51 Tex. Civ. App. 531, 112 S. W. 441.

We find no evidence which justified the trial court in submitting the question of undue influence to the jury, nor to support the finding of the jury that the contract in question was procured by such influence.

Appellee Peter Borgstadt, by his cross-assignment No. 1, insists that the trial court erred in admitting in evidence, over his objection, the contract entered into by W. F. Bender and Mrs. Hafer, hereinbefore set out, for the following reasons:

(1) "Because said paper shows no independent consideration within itself, it merely showing it is an offer on the part of Mrs. Mary Borgstadt to sell to W. F. Bender a certain piece of property within a certain time, and it shows there was no consideration paid for such offer, and therefore it is unenforceable as to its specific performance for that reason."

(2) "Because the paper offered shows no mutuality or binding contract from Mrs. Mary Borgstadt to W. F. Bender or any binding contract on his part to her that could be enforced in the form of specific performance."

(3) "Because said paper described a piece of property different from that which is described in plaintiff's petition, and about which he seeks to enforce specific performance in this suit,

the purported contract describing a piece of property as lot 11 in block 57, and plaintiff seeks in his petition to have a contract enforced against 45 feet off of the west part of lots 5 and 6 in block 157, and it varies and differs from the pleadings in the case."

(4) "Because the said instrument shows it is merely an option, without consideration, and not binding, and there being no evidence to show it was accepted."

[4, 5] We overrule this assignment. We find that the considerations supporting the making of said contract were mutual and bound both parties thereto. We also find that the property in question was described in the contract between W. F. Bender and Mrs. Hafer as:

"A part of lot 11 in block No. 57, S. S. B. B., in the city of Houston, Harris county, Tex., fronting 45 feet on McKinney avenue and running back between parallel lines 100 feet, more or less, for depth, forming a rectangle, * * * being known and designated as No. 1816 McKinney avenue, and being generally known as the residence or homestead place of first party [Mrs. Mary Borgstadt], upon which she has resided for about 40 years."

Appellant's petition described the lots sued for exactly as they are described in the contract, except they are designated as "parts of lots 4 and 5 block 157," instead of "part of lot 11 in block 57." It is also alleged in the petition that the property described in the contract is the identical property described in the petition, and that that part of the description of said property in said contract which designates the same as a part of lot 11 in block 57 was inserted in said contract by mutual mistake, and was a clerical error, and was so erroneously inserted by inadvertence. And it is further alleged that the property sued for and the property described in said contract is one and the same property, and that it is the property upon which Mrs. Hafer resided for the last 40 years next preceding her death, and that it is generally known as the homestead of Mrs. Hafer, and that it is located on McKinney avenue, in the city of Houston, and is known and designated as No. 1816 McKinney avenue, and that it does front 45 feet on McKinney avenue, etc. The undisputed evidence supports these allegations.

"The office of description in a deed or other writing is, not to identify the land, but to furnish means of identification." Duffie v. White, 184 S. W. 1065; Holley v. Curry, 58 W. Va. 70, 51 S. E. 135, 112 Am. St. Rep. 944, and cases there cited.

There is no fatal variance in the description of the property as made in the contract and in appellant's petition.

By appellee's cross-assignment No. 2 he insists that the trial court erred in refusing him permission, after plaintiff had introduced his evidence and rested his case, to file his trial amendment alleging for the first time that W. F. Bender procured the execution of the contract by Mrs. Hafer by means of false and fraudulent representations made by said Bender to Mrs. Hafer, for the purpose of inducing her to execute,

and which did induce her to execute said contract, that the whole of the consideration agreed to be paid by W. F. Bender for the property in question was not stated in the written contract, and that after Mrs. Hafer discovered this fact she withdrew her said contract, etc.

[6-8] It was not intended by the rule allowing the filing of trial amendments that an amendment so filed might be made as a matter of right so as to include amendments setting up new causes of action or new defenses not pleaded or set up in some former plea, and which might cause a reopening of the entire case after the case has proceeded to trial. A trial amendment comes too late when offered after the parties have entered upon the trial, if such amendment would probably cause a delay in the trial of the case, and the discretion of the court in refusing same will not in such cases be interfered with by the appellate court. White v. Bank, 27 Tex. Civ. App. 487, 65 S. W. 498. The cross-assignment is overruled.

Having reached the conclusion that the undisputed evidence shows that appellant, Bender, was entitled to the decree prayed for, and that there was no evidence showing that the contract in question was procured by him by the exercise of undue influence over Mrs. Hafer, deceased, and as the case seems to have been fully developed, we further conclude that the judgment of the trial court should be, and it is here, reversed, and judgment is here rendered directing Louis Bender, executor, to execute a deed in his official capacity conveying to said W. F. Bender the property in his petition described.

Reversed and rendered.