SALINAS et al. v. GARCIA et al.†

(Court of Civil Appeals of Texas.    March 1, 1911.    On Motion for Rehearing, March 15, 1911.)

1. WILLS (§ 55*)—TESTAMENTARY CAPACITY—EVIDENCE.

Evidence *held* to warrant a finding that testatrix, though 90 years of age, blind, partially deaf, and bedridden when she made her will, had testamentary capacity.

[Ed. Note.—For other cases, see Wills, Dec. Dig. § 55.*]

2. WILLS (§ 21*)—"TESTAMENTARY CAPACITY"—RULE.

The test of testamentary capacity is not whether the person who has made a testamentary disposition of his property was of a high order of intelligence, but whether he knew what he desired to do with his property, and was able to call to mind those to whom he wished to give it, and associate the property to be given with the particular beneficiary in each case.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 48, 49; Dec. Dig. § 21.*

For other definitions, see Words and Phrases, vol. 8, pp. 6929–6931.]

3. WILLS (§ 155*)—"UNDUE INFLUENCE"—WHAT CONSTITUTES.

Persuasion, entreaty, cajolery, importunity, argument, intercession, and solicitation do not constitute undue influence sufficient to set aside a will unless shown to have subverted and overthrown her will, and caused her to do that which she did not desire to do.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 375–381; Dec. Dig. § 155.*

For other definitions, see Words and Phrases, vol. 8, pp. 7166–7172; vol. 8, pp. 7823, 7824.]

4. WILLS (§ 163*)—UNDUE INFLUENCE—BURDEN OF PROOF.

The burden of establishing undue influence in a will contest is on the contestants.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 388–402; Dec. Dig. § 163.*]

On Motion for Rehearing.

5. WILLS (§ 302*)—EXECUTION—KNOWLEDGE OF CONTENTS—EVIDENCE.

In proceedings for the probate of a will, evidence *held* to warrant a finding that the draft which subsequently became the will was read over to testatrix in Spanish, which was the only language she understood, before she signed it.

[Ed. Note.—For other cases, see Wills, Dec. Dig. § 302.*]

6. APPEAL AND ERROR (§ 1011*)—REVIEW—FINDINGS BY TRIAL JUDGE.

Findings of fact by a trial judge based on conflicting oral testimony taken before him will not be set aside on appeal.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3983–3989; Dec. Dig. § 1011.*]

Appeal from District Court, Webb County; E. A. Stevens, Judge.

Application by Rosendo Garcia and others for the probate of the will of Carmen Benavides de Garcia, deceased, to which Augustin Salinas and others filed objections. From an order admitting the will to probate, objectors appeal. Affirmed.

Cobbs, Taliaferro & Cunningham, for appellants.    A. C. Hamilton and William Aubrey, for appellees.

FLY, J.    On March 19, 1908, application was made in the county court of Webb county by Rosendo Garcia to probate the will of Carmen Benavides de Garcia, who was alleged to have died on March 14, 1908, and which will was alleged to have been executed on December 16, 1904, and by which she disposed of her estate, consisting of real and personal property, of the probate value of $15,000, and therein appointed the proponent of the will the executor thereof.    We infer from allegations in the amended contest filed in the district court that probate of the will was contested in the county court by numerous parties headed by Augustin Salinas, claiming to be grandchildren and heirs of the testatrix, and we will be compelled to presume that some kind of judgment was rendered in the county court from which an appeal was perfected, as neither the judgment in the county court or any other proceedings therein are copied into the record, except the application for probate and the citation.    It is recited, however, in the judgment of the district court that the case "came on to be heard on appeal from the judgment of the county court of Webb county, Tex."

In the district court the grounds of contest were that the testatrix was without testamentary capacity, and wholly incapable of making a will, giving as reasons therefor that she was 90 years of age, and for 5 years had been deaf, blind, nervous, sick, and bedridden, and was afflicted with senile dementia, and that undue influence on the part of her son, Rosendo Garcia, had caused the making of the will.    The court rendered judgment probating the will and appointing Rosendo Garcia independent executor.

The will of Carmen Benavides de Garcia was dated on December 16, 1904, and by it she bequeathed to her sons, Leonidas Garcia and Rosendo Garcia, one half of all her property, and bequeathed the other half to all her other sons and daughters, except her daughter, Margarita Garcia, who had already received her share of the estate, and appointed Rosendo Garcia, her son, executor without bond, and provided that no action should be taken in the county court, except to probate and record the will, and return an inventory and appraisement and list of claims.    The testimony showed that the testatrix was 90 years old at the time she made the will, and that she was blind, partially deaf, and bedridden, but there was evidence of the fact that her mind was clear, and that she fully understood the terms of the will, and willingly affixed her mark to her name which was signed to the will.

One of the attesting witnesses to the will was Jose Maria Rodriguez, a man of such standing and reputation in Webb county that he has been its county judge for 32 years, and he testified as follows: "I was a witness to

the execution of the will. I believe the testatrix was about 90 years old. At the time of the execution of the will, I believe her mind was sound, perfectly sound, and my reason for believing so is I approached her with the will in my hand which I had written, and I said to her, she recognized me at once, 'Madam Garcia, I have written the will in accordance with the message you sent me by Rosendo Garcia.' And then says I to her, 'Your message by Rosendo told me that you wanted to leave or bequeath half of all your property to Rosendo Garcia and Leonidas Garcia, and the other half you want to leave or bequeath to your other children.' And she made this distinction because Rosendo and Leonidas had taken care of her and supported her from the time of the death of her husband until the present time. Those were the only two children who had done so. Then says I to her, 'Is that your will according to your statement?' 'Yes.' 'Now, who do you want for executor?' She says, 'You put down Rosendo.' 'Well, that is the way I have written it, without bond. Is this what you want?' She said, 'It is all right.' 'Now, all you have to do is to touch a pen and sign it, and we have to have two witnesses,' says I to her. She says, 'Well, you can be one and Don Dario Sanchez one.' Well, then we signed it, and she went on and had a long conversation with me. She says, 'How is your daughter, Natalie Rodriguez?' alluding to my daughter. I answered her that she was living in Encinal. Then, after she inquired about my children, Natalie and Ambrosia, she went on and asked for my wife. I said, 'My wife is here, present in the house.' She said, 'Bring her up here. I want to speak to her and shake her hand.' Then she had a long talk with her about little family matters, etc. Her mind was perfectly clear, and she did not appear to be sick at all. This was away back in 1904. At the very time the will was signed she wanted to talk to Dario Sanchez. Dario came up and had a long talk with her, and she inquired about his family, his wife, and children, and talked over old times with him. These things that I have stated went to indicate the condition of her mind, and I came to the conclusion that her mind was perfectly clear and sound. I have been county judge since 1878. Mrs. Carmen Benavides de Garcia is now deceased, and I attended her funeral."

Dario Sanchez, the other attesting witness, testified: "I am 54 years old, am a stock raiser and live temporarily in Knoxville, Tenn. I knew Mrs. Carmen Benavides de Garcia. She was about 90 years old. Her mind was sound. I base my opinion upon her actions and conversation at the time; they being those of a person of clear and sound mind. She said she wished to make a will because she wished to make a distinction between her children. Leonidas and Rosendo Garcia, her sons, she said had stayed with her in her old age, looked after her, and supported her. She said to me, 'I understand that you have a big family. How is my daughter Luisa's godchild?' meaning my eldest daughter, Elvira, who is the godchild of her daughter, Luisa. She also inquired about my wife and children, and in the conversation with me she appeared to be perfectly rational, and said her only afflictions were old age, loss of sight, and hard hearing. Her estate is mostly real estate, and maybe a little personal property, I do not know the extent. I signed the will as a witness at her request and in her presence and in the presence of each other. She requested Mr. Rodriguez to sign it for her, which he did, and then she touched the pen, and he made the cross."

A priest, introduced by appellants, testified that in 1903, 1904, or 1905 the testatrix, in her house, made confession to him.

Some of the witnesses for appellant swore that testatrix was very sick in 1904 and prior to that time, and at least one, D. C. Lachica, swore that "she was not considered sick," and that "as a matter of fact the only thing that was the matter with her was that she was blind, partially deaf, and her knees had given away, and could not walk."

Concha Salinas, one of the contestants, stated that the testatrix had a great many relatives, and that she remembered most of them. The same witness testified that the mental condition of the testatrix was good.

Gomez de Garcia, an attendant on the testatrix, testified: "Yes; I know about Mrs. Garcia making a will, because I was the first one to know about it. I was the first one to whom the old lady communicated it, and asked me to call her son, Rosendo, to her to have it made. She told me that she wanted to make her will and to call her son, Don Rosendo, but that day Don Rosendo was not in town. That afternoon Don Rosendo came from the ranch, and I told him that the old lady wanted to see him, and it was that afternoon that the will was made. At the time that I speak of we used to take her out around the yard. Mrs. Garcia was blind and was deaf, but she could hear in one of her ears by speaking close to her. I talked with her, and she could talk just as plain as I am talking right now. She told me she was going to leave everything to her two sons that had made her company all the time, because her other children, her daughters, had been very ungrateful."

R. V. Martin, district clerk of Webb county, stated that he was a grandson of the testatrix, that he was married on December 24, 1906, and he and his bride went to see his grandmother on that day, and, when she was told of the marriage, she congratulated the couple. He had no interest in the contest. He stated that the witness Dario Sanchez was vice president of the Laredo National Bank, had been mayor of the city of Laredo, and sheriff and tax collector of Webb county for a number of years.

Rosendo Garcia testified: "I remember the occasion of the making of the will in contest here. I was in my room when the servant came in. I wondered what she wanted, but I went to see her, and I went to the place where my mother was, and she said she had sent the servant for me. I asked her what she wished, and she said that she wished to make a will. I had asked her to make a will. This was in my mother's house, where she lived and died. It was about the 13th or 14th day of December, 1904. I came into the room, and she told me she wanted to make out a will. She said she would give one half of her estate to Leonidas and myself, and the other half would be divided between her other children. Then I told her it would be better to give all equal parts. I told her that I would like to be appointed administrator without bond. She then stated to me that she was the owner of all she had, and could do as she pleased with it, and asked me to go and get Jose Maria Rodriguez, and to tell him to make out the will, allowing my brother Leonidas and myself one half of the property, the other half to be left to the rest of the heirs. I went and saw Jose Maria Rodriguez, and told him what my mother said. He lived on the north side of the plaza, and we lived on the south side, and I only had to cross the plaza. My mother said she made that distinction because she did not think she had any daughters, as they never went to see her, and they never did. Then I went to J. M. Rodriguez, and he said he would have it ready by that afternoon, and then I called for my compadre, Dario Sanchez, for one of the witnesses. And then went to J. M. Rodriguez' house and then to Dario's. J. M. Rodriguez and Dario Sanchez and myself were at J. M. Rodriguez' house, and Don J. M. Rodriguez' wife said that she would like to go. We stayed there a while and talked. We then went to where my mother was, and talked to her, and she talked to us. Don J. M. Rodriguez stated to her that she had advised him to make the will, and that he had made it, and he began to read it to her close to her ear. When he finished reading it, he asked her if that was her will. She said, 'Yes,' that it was as she wished it."

John Martin and Juliana Leyendecker swore to facts tending to show the sanity of testatrix. They were not interested in the suit.

There was much testimony tending to show imbecility and incapacity on the part of the testatrix, a large part of it, however, from interested witnesses. The conflict was a matter to be solved by the trial judge, who was acquainted with the witnesses, saw their manner of testifying, knew their character and reputations for probity and veracity, and was in an advantageous position to pass upon their credibility and the weight to be accorded their testimony. He chose to credit the testimony of the witnesses for appellee, which was sufficient to sustain the validity of the will. No high degree of intelligence is required of the testator, but if he knows what he desires to do with his property, and remembers those to whom he wishes to give it and so bequeaths it, the will is valid. Neither is it necessary that the testator should be actually and fully acquainted with the details of his business, or the nature, extent, and amount of his property in order to make a testamentary disposal of it valid. Brown v. Mitchell, 75 Tex. 9, 12 S. W. 606.

Nature is partial and niggardly in dispensing the gifts of genius and extraordinary talent, but she is generous in giving to most human beings the capability of attending to the ordinary affairs of life, and for these, the great majority of mankind, laws are enacted and systems of jurisprudence erected, and their contracts, their disposition of their property by will, deed, or other conveyance, freely and voluntarily made, uninfluenced by fraud, deceit, or mistake, will be respected and enforced by the courts of the country. The test is not whether the person who has made testamentary disposition of his property was of a high order of intelligence, but the humbler test is applied, Did he know what he was doing with the property which he knew he owned when he executed his will, and did he perform the act of his own free volition, and because he desired to do so? He may be old and infirm, weakened in energy, and impaired in the senses, but, if he responds to the test which is applied to all human beings alike, his disposition of his property will be respected and upheld by the courts of the country. There can be no age limit prescribed at which it can be decreed that "a sound and disposing memory" has been lost because the mind of the man of 80, or 90, or even 100 years of age, may be bright, active, and brilliant, while the man of 50 or 60 may have entered the pitiable state of garrulous senility or brutal imbecility. Underhill on Wills, § 117. Mental and physical decay do not keep step with each other, and, after a man has become impaired in all the five senses, he may retain intelligence sufficient to enable him to understand and prepare for the testamentary disposition of his property. It is often the case, when a man has outlived his generation, and exists on memories of the past, when the blighting hand of decrepitude and decay is laid upon him, when "life's shadows are meeting eternity's day" and the end is near, that those about him will forget and "shut their doors against a setting sun," and the only weapon of defense that he has against such wrong and neglect are the possessions that he has gathered and laid away for just such a day. As said by the great Chancellor Kent in Van Alst v. Hunter, 5 Johns. Ch. (N. Y.) 148: "The control which the law still gives to a man over the disposal of his property is one of the most efficient

means which he has in a protracted life to command the attentions due to his infirmities. The will of such an aged man ought to be regarded with great tenderness." And in the case of Sloan v. Maxwell, 3 N. J. Eq. 563, the court said: "The power of disposing of property is an inestimable privilege of the old. It frequently commands attention and respect when other motives have ceased to influence. How often, without it, would the hoary head be neglected, deserted, and despised." It is indeed a sad commentary upon humanity that when filial love has failed, and gratitude and devotion have passed away, the fear and awe inspired by the power of testamentary disposition of property becomes the "shadow of a rock in a weary land," and will insure the greatest respect and most devoted attention. Except in extreme cases of imbecility, the aged and decrepit should not be deprived of this last defense against ingratitude and base neglect.

Whatever may have been the inspiration for the acts of her two sons, she had, in the long gloomy years of her old age, been tenderly cared for by them, while her daughters seem to have forgotten her and neglected her to such a degree as to cause her to comment on it, and give their ingratitude as a cause for not remembering them in her will. It seemed that she desired to give the whole of the property, as she might with perfect propriety have done, to her sons who had cared for her and for the property, but after a conversation with Rosendo Garcia she gave them only one-half the property. She knew who had not neglected and forgotten her in her extreme old age, and just before executing the will she stated that she wished to execute a will because she desired to make a distinction between her sons, who had stayed with and supported her in her old age, and her daughters, who had forgotten their filial duties. We will not disturb her will on account of her old age and infirmities when there is abundant evidence to show her capacity to make a will. As said by Justice Neill, speaking for this court, in McIntosh v. Moore, 22 Tex. Civ. App. 22, 53 S. W. 611: "There is no presumption against a will, because made by a man advanced in age. * * * Incapacity cannot be inferred from enfeebled condition of mind or body; for, if incapacity could be inferred from such facts, a man by mere inference might be deprived of his legal right to dispose of his property as he sees fit." The evidence showed without contradiction that the will was read to the testatrix in Spanish, her mother tongue, and that she expressed approval of it and thoroughly understood it. Her inability to see and read the will under such circumstances would not invalidate it. It is stated in 1 Jarman on Wills, p. 63, that blindness or deafness alone would not incapacitate to make a will, but it is further stated that it is the rule that a person born deaf and dumb

is prima facie incapacitated, but may be shown to have capacity, and that a person who has been from his nativity blind, deaf, and dumb is intellectually incapable of making a will. Such rules may have prevailed before modern education had overcome deafness and dumbness and fitted persons so afflicted for many of the highest duties of society and citizenship, which education has given at least one noted example, in the person of Helen Keller, of one deprived of sight, hearing, and speech overcoming all these great infirmities, and becoming a proficient scholar and brilliant writer, not only in English, the language of her fathers, but in other modern languages and in Greek and Latin. No one who has read the intellectual literary essays of Helen Keller, who is informed as to her many and brilliant accomplishments, would harbor the thought for a moment that she is not as fully capable as any one of making a valid will. With much more force can it be said that one who has once been possessed of the sense of sight is not incapable of executing a will. The modern view of the subject is in Underhill on Wills, §§ 118, 119.

There was no proof of such undue influence as is recognized by law in will cases. Patterson v. Lamb, 21 Tex. Civ. App. 512, 52 S. W. 98; Barry v. Graciette, 71 S. W. 309; Wetz v. Schneider, 34 Tex. Civ. App. 201, 78 S. W. 394. As said in the last case cited: "Not every influence brought to bear upon the mind of a testator by a beneficiary will be classed as undue influence. Persuasion, entreaty, cajolery, importunity, argument, intercession, and solicitation are permissible, and cannot be held to be undue influence unless they subverted and overthrew the will of the testator and caused him to do a thing that he did not desire to do. No more could a will made from mere persuasion, entreaty, or argument, which has been weighed and considered by the testator, and his own mind made up and voluntarily formed, be classed as undue influence, than could the arguments of counsel to a court, which are weighed and considered in arriving at a just conclusion as to the law of the case, be denominated undue influence." The burden of establishing undue influence was on appellants, and they failed to show it.

The assignments of error from the fourth to the fifteenth, inclusive, are not followed by propositions or statements, and will not be considered. All of the other assignments have been considered and disposed of by this opinion adversely to appellants.

The judgment is affirmed.

### On Motion for Rehearing.

It is contended that the will was not read to the testatrix in Spanish, although Dario Sanchez swore: "The will was read over to her, deceased, in Spanish. * * * He read it over in Spanish, and she said that was

what she wanted, and asked us to sign it. * * * Judge Rodriguez, himself, read the will in Spanish, read it line by line and sentence by sentence." That evidence was credited by the trial judge, and this court has no authority to set it aside or ignore it. If the will was read to her and explained, as the testimony tends to show, the testatrix knew that Margarita Garcia, her daughter, was excepted from the bequest, for the reason, as recited in the will, because she "has already received her share of my estate." That statement in the will was not contradicted, and Margarita Garcia made no effort to contest the will. Appellants contend in their argument on the motion for rehearing that "the old woman was deceived by that statement, because she did not know that Margarita Garcia, one of her children, was left out of the will, and not named in it, having named all the other children," and yet the will shows that she was specially mentioned therein and a reason given for not bequeathing her a portion of the property, and, instead of not being mentioned in the will, she and her two brothers were the only ones named in the will.

The witnesses Jose M. Rodriguez and Dario Sanchez were not interested in the disposition of the property of the testatrix, were honored citizens of Webb county, and cannot be disqualified as witnesses because they were friendly, or even related to the proponents of the will. The law does not require that the attesting witnesses to a will should be unfriendly to those to whom the property is bequeathed.

It is incumbent on this court to consider and give full weight to that part of the testimony which tends to support the judgment of the trial judge, and such judgment cannot be set aside merely because the evidence upon which it is based was contradicted by the testimony of the adverse party. The trial judge knew the witnesses, heard their testimony, weighed it, and gave that of appellees weight and effect, and this court cannot substitute its opinion as to the credibility of the witnesses and the weight to be given their testimony for that of the trial judge. What this court might have held, unhampered by the judgment of the trial court, is a matter of no consequence, as there is testimony that sustains the judgment and the appellate court is bound by it.

The motion for rehearing is overruled.