In re FULLHAS' ESTATE.

BENDIG v. BERLIN.

(No. 7965.)

(Court of Civil Appeals of Texas. Galveston. Jan. 21, 1921.)

1. Wills ⚫≈55(5), 166(8)—Testator not shown to be incapacitated or unduly influenced.

On contest of a will, evidence *held* insufficient to show that testator was not physically or mentally able to execute a valid will, or that he was in such weakened condition as to be unable to resist the proponent, or that the will as probated was hers and not his.

2. Wills ⚫≈303(6)—Affidavits of subscribing witnesses not exclusive method of proving will.

Rev. St. 1911, art. 3267, providing that a written will may be proved by the written affidavit of subscribing witnesses, does not lay down an exclusive method, but merely a permissive one, and does not forbid the introduction of other than the statutory proof.

Appeal from District Court, Galveston County; Robt G. Street, Judge.

In the matter of the estate of Louis Fullhas, deceased. Application by Mrs. Jennie Berlin as independent executrix for the probate of the will of the deceased. From a judgment admitting the will to probate, Mrs. Ottilia Bendig appeals. Affirmed.

Lockhart & Lockhart, of Galveston, for appellant.

L. R. Patton and James B. & Charles J. Stubbs, all of Galveston, for appellee.

GRAVES, J. Mrs. Bendig appeals from a judgment of the district court of Galveston county, admitting to probate, over her protest, the will of Louis Fullhas. It is thought no more satisfactory statement of the case as developed might be presented than that made by the trial court in findings of fact and conclusions of law, filed at appellant's request. Except one immaterial omission, in full it is as follows:

"Conclusions of Fact and Law.

"This case was heard in the district court on an application for certiorari granted by the district judge to the county court of Galveston county, in probate. The case arose in the county court on an application by Jennie Berlin, as independent executrix for the probate of the will of Louis Fullhas, deceased, filed May 2, 1919, and on the contest of said application by Ottilia Bendig, sister of deceased and mother of Jennie Berlin.

"The petition for certiorari recites that in the county court the contestant alleged 'that at the time said pretended will was alleged to have been made and executed by said Louis Fullhas he was incapable, both mentally and physically, of making a valid will and testament, and that the contents of said will were not the will of the said Louis Fullhas, but of said Jennie Berlin, who imposed her own will on him when he was not able to resist on account of his physical and mental weakness,' 'by which pretended devise of his real property was made to her, the said Jennie Berlin, and to her child, and a pretended bequest of his personal property was also made to her and her child, and she was nominated as independent executrix of his estate.'

"The petition for certiorari further charges that the evidence adduced on the hearing in the county court clearly established that the deceased at the time of his execution of the will by making his mark was mentally and physically incapable of making a 'valid will, but that the county court nevertheless ad-

mitted the same to probate. Besides a general demurrer and general denial the proponent of the will, defendant herein, filed pleas in abatement and special exceptions, all of which were raised in favor of the plaintiff contestant. And hearing was had exclusively on the grounds specified in the petition for certiorari, viz. whether the deceased at the time of his execution of the will had the mental and physical capacity to make a valid will, and whether Jennie Berlin, niece and independent executrix, exercised undue influence over him to induce him to make the will in favor of herself and her child.

"The case was tried before the court without a jury. A mass of irrelevant testimony was heard, no exceptions being taken. Only testimony material to the issues has been considered, and only the material facts will be set out in the findings of the court.

### "Facts.

"The deceased was an old man, a Russian, of the peasant or working class. He had lived in Galveston for more than 40 years, was unmarried and without descendants. He was a blacksmith, and up to the time of his last illness, some seven months before his death, he had been working aboard a government dredge in Galveston Bay for many years. His entire estate consisted of one lot in the city of Galveston with two houses on it, worth from $2,000 to $3,000, and of $515 in money, two Liberty Bonds of $100 each, and some diamond rings, except that all the above personal property was claimed by Mrs. Bendig as a gift made to her and taken possession of by her a few days before his death. There was also some oil stock, but what it was and whether it was worth anything or not was not disclosed by the evidence.

"The deceased had had brothers and sisters in Russia, but nothing is known of them or their descendants. His only known relatives living were his widowed sister, Mrs. Ottilia Bendig, and her daughter, Jennie, now Mrs. Berlin, and the child, Erma, above 5 years old, daughter of Mrs. Berlin. He brought his sister and her child (then about 10 years old) from Europe to live with him in 1904. The family have lived together most of the time since, but the evidence shows there has been a great deal of dissension among them. At the time of his death the sister alone was living with him.

"The defendant, proponent of the will, assumed the burden of proof on the statutory requirements.

"Dr. W. L. Hoecker, 33 years old, graduate of the Medical Department of the University of Texas, whose experience is shown to have been 14 months' service as interne at St. Mary's Infirmary, Galveston, 1 year as surgeon for American Smelting & Refining Company in Mexico, 5 years as assistant chief surgeon of the Galveston, Houston & Henderson Railway Company, 1½ years' service as captain in the medical corps of the army, and private practice since his graduation in 1909, was the attending physician of the deceased from the early part of March, 1919, to April 28th of that year (or about that date), the day of his death. He visited him at his home until he was taken to the infirmary on the 21st of April. He

visited him at times every day. Deceased had a complication of dropsy, kidney trouble, and heart disease. The doctor's first professional service to the deceased arose from his having been called to see Mr. Berlin, husband of Jennie Berlin, at their home. Mrs. Bendig and Mrs. Berlin brought Mr. Fullhas over to the Berlin house that he might examine him. Mr. Hoecker saw him on the morning the will was made and probably in the afternoon also, but was not quite sure about the latter, as if he called at that time it was incidental to another patient in the infirmary, and no charge was made, and therefore it was not put down on his visiting list. Before the will was made and on the same day he told Mrs. Bendig and Mr. Berlin that because Louis Fullhas was nearing the end if a will was to be made it had better be attended to. He had mentioned the matter once before. On direct examination, in reply to questions asked, the doctor said:

"'April 21, 1919, he went to St. Mary's, and died on April 28, 1919.' 'I don't know the date; he was there seven days.' 'Saw him at least one time in the morning (meaning on the 22d of April), and I am pretty sure I saw him that afternoon.'

"'Q. What was his mental condition? A. I would consider it rational at that time.

"'Q. And when you saw him in the afternoon, what was his mental condition? A. As far as I can recall it was rational; depending on the condition of the man, it was rational.

"'Q. Was his mind clear on the day after that and for several days after that? A. As I recall, it was; he was weak, of course, from his critical condition, heart condition.

"'Q. That did not affect his mind, I understand you say? A. No; just general weakness.

"'Q. Was his mind in such condition that he could make a will? A. Why, I think it was. I think he knew where he was and appreciated his condition and all.'

"On cross-examination, in answer to questions having reference to the day of the execution of the will:

"'Q. What time in the morning had you been there? A. 10:30.

"'Q. Had you seen him before this particular day when he was in one of his spells, when he was not rational? A. Spells?

"'Q. When he was not rational? A. No.

"'Q. Did you happen to be there at any time when he was yelling and cursing and making a tremendous noise and carrying on at a terrible rate? A. No; I never was, but both his sister and niece told me he did that at home; in fact I heard him cursing because he seemed not to have any particular care for any of them—nobody in general as far as that went.

"'Q. You mean either his sister or the daughter? A. Or the niece.'

"He testified:

"'I think I was called Sunday night (meaning the 21st of April); went down to St. Mary's about 7:30 or 8 o'clock.'

"'Q. What was his condition then? A. I went to the infirmary. He was a great deal worse than he had been. He was able to get up and get around; the lower limbs were troublesome, though he was able to get out on the porch.

"'Q. Now, Doctor, tell us what his mental

condition was on April 21st, when you were at the hospital? A. It was rational.

" 'Q. Doctor, how did you come to recall so clearly his condition on the day you said the will was made from the condition the day before or the day before that? What is there in your mind that makes you remember specifically his condition the day that the will was made? Let the court have the benefit of that. A. Well, I thought he was able to make a will at that time. If he was so drowsy or irrational on that date I would not have suggested that the will be made. As to the difference between that day, particular day, and the day before I don't recall. I haven't made any such testimony as that, that there was any particular difference between the two days, or the day preceding that, because I don't recall exactly.'

"The doctor testified that Mr. Berlin called at his office at 11:30 that morning. 'It was the first day he had been out of the house down to see me since his illness. And while he was in my office I mentioned the fact that if they were to make a will, the family, that they had better make it as soon as possible.'

"He testified that he so advised because the 'dropsical condition increasing, showing the blood was not flowing through the circulatory system.'

"Ferdinand Jautze, a witness for the defendant, visited deceased on the evening of the day he made his will at St. Mary's Infirmary and testified:

" 'Q. What conversation did you have with him? A. First thing when I come in there he said, "Shake hands with me," and says, "Why didn't you come to see me long time before? You knew I was sick?" I said, "Yes; I knew you were sick, but I didn't know you was that bad off;" and he said afterwards— he called me right to him—"You know," he said, "you know I made my will to the little girl." That is what he told me.

" 'Q. How was his mind at that time? A. His mind was clear, sound, nothing the matter with it.

" 'Q. Do you know how he felt towards the child Erma, his little grandniece? A. He loved the child all the time.'

"Mrs. Jautze,. wife of Ferdinand, testified to the same effect.

"Ibert Schuman, a witness for defendant, a neighbor living in the same block, a friend for 35 years, was with deceased the day he was taken to the infirmary, and testified:

" 'Q. Did you see him (meaning Louis Fullhas) the day he was taken to the hospital? A. Yes, last night I helped bring him down the steps.

" 'Q. When he went to the hospital? A. Yes; that was the last time.

" 'Q. What was the condition of his mind at that time? A. Oh, well, he was all right, and got so much pain in his legs.

" 'Q. How was his mind? A. He was all right.

" 'Q. Was his mind sound? A. He was all right in his brain. He said Mrs. Berlin's baby got his property. He said couple of times.'

"Mrs. Jennie Berlin, called as a witness in her own behalf, had lived in Galveston 16 years. She is now 26. On direct examination she testified:

" 'Q. Were you at St. Mary's infirmary the day that Mr. Louis Fullhas made his will? A. I was.

" 'Q. Were you present when the will was being prepared? A. Part of the time I was, and I went out of the room. I was called out of the room by a nun.

" 'Q. Part of the will was written when you were called out? A. The first part. The lawyer read something out of a book, and my uncle was starting to tell him what he wanted in the will, and then I went out. I was called out.

" 'Q. When did you go back again? A. I came back when the lawyer was reading it, and he started to read it, and my uncle told him he could not hear very well, and he wanted him to sit closer; so he did. I sat on the other bed, and heard what he read in the will.

" 'Q. Did you send for the lawyer to come out to write his will? A. He asked me to.

" 'Q. Who asked you to? A. My uncle.

" 'Q. Had you talked to him about his making the will? A. I never did, because he was very funny: He says, "I am not going to make my will before I die," and so he was with his money. When I begged him to put the money in the bank he bawled me out, said the bank would go into bankruptcy, and so with will, he said, "When my time comes I will make my will, but not before."

" 'Q. How did you happen to telephone for Mr. Patton to come out to write your uncle's will? A. He told me to. I went to the infirmary, and he asked about household affairs and everything, and he says, "Jennie, I think I want to make a will." I says, "Honey, you don't want to make no will," and he got mad. "Well," he says, "I know what I want to do; I want to make a will." I didn't think he was that bad off. I went downstairs and phoned to Dr. Hoecker to see if he thought uncle had to make a will. He said, "If he wants to, why don't you let him make it?" But I didn't think it was necessary, so when he told me that I phoned for Lawyer Patton, and Dr. Hoecker had told me about him in my uncle's presence when uncle happened to come to my house. So I phoned to him. I went to my uncle, and told him I had phoned for the lawyer, and he said that was all right, but he wanted to get a good one. So I said I thought he was all right. I had never seen Lawyer Patton in my life before, but I heard Dr. Hoecker talk about him, and I thought he was all right.

" 'Q. When Mr. Fullhas was telling Patton what to write in the will, were you there, present? A. At the first part I was.

" 'Q. When he said to whom he wanted to give his property, were you there then? A. No; I think it was the jewelry when he first started in. I can't remember.

" 'Q. How did you know what was going to be in that will until you heard it read by Mr. Patton? A. No; I did not, because he never mentioned what he was going to put in the will. He always said it was nobody's business except his own.

" 'Q. I will ask you how the will was signed by Louis Fullhas? A. Why, Lawyer Patton told him to sign his name, and he says, "I ain't got my glasses along" and pointed to his

nose, and he says, "My hand is shaky, and I don't know how I am going to start on that." He says, "Well, I will help him." So he took the pen in his hands, and Lawyer Patton touched the pen and kind of led him.

" 'Q. Mr. Patton wrote his name for him? A. Yes; I think so.

" 'Q. At Mr. Fullhas' request? A. Yes; because my uncle asked him if a cross won't do, and Patton said, "All right."

" 'Q. Now, did you do anything to compel your uncle to make that will? A. No; I did not.'

"Julia Lee and Thelma Jones, the attesting witnesses, were nurses in the infirmary. They testified that they were called in to witness the will, that Mr. Patton asked deceased if he wanted them to witness his will, he said, "Yes." He said to us, "Will you sign my will?" They both signed in the presence of the testator and in the presence of each other. Both deceased and Mr. Patton had hold of the pen when he signed by making an X in their presence. Neither of them had ever seen him before, except Thelma Jones had seen him in the ward the day before, and they never saw him afterwards. They both refused to say whether he was rational or not, stating that their acquaintance with him was not sufficient to enable them to judge. They were 18 and 19 years of age.

"Julia Lee in answer to 'Q. What was his appearance?' answered, 'A. His appearance was that he was rational and sound of mind, that was his appearance, but that does not come to any conclusion.'

"L. R. Patton, a witness for defendant, is a lawyer, a member of the Galveston bar, about 36 years old. He wrote the will, and it was signed by the testator and witnessed by the attesting witnesses on the day it bears date, 22d of April, 1919.

" 'Q. Who gave you the contents of the will? A. Mr. Fullhas.

" 'Q. Is this will written exactly as stated by him? A. Yes, sir; the substance of it.

" 'Q. What appeared to be his mental condition? A. Appeared to be rational.

" 'Q. Did you write down the disposition of his estate exactly as he stated to you? A. Yes.

" 'Q. Did any one else prompt him, or did any one prompt him or control him whilst you were writing this will as to any disposition that he was to make of any part of his property? A. No, sir.

" 'Q. When the signature was made, how was that made, the signature of the testator? A. When the witnesses came in they were standing on the south side of the bed, and I announced that these young ladies would witness the instrument, witness his will, and I offered him the pen, and, as I recollect, he said his hand was shaky, and he could not write; and then I asked him if he wanted me to help him, and he said "Yes," and so I told him to go ahead and make his mark with my hand on his pen—that is the way he made the mark —and I told him I would go ahead; I would spell out his name and put "his" above and "mark" below.

" 'Q. Did he understand that he was making a will? A. Yes, sir; I asked him to announce to the witnesses what the instrument was, as I remember it, and he said, * * * he told

them it was his will, and I asked him to ask them individually, asked him to ask them to witness it, and he turned to the one who signed first, and asked if they would sign his will, witness his will, and he turned to the other—

" 'Q. He declared this to be his will? A. Yes, sir.

" 'Court: You said "he turned to the other." A. I asked him to ask her to witness the will, and he asked her to witness his will.

" 'Q. Did you have any interest in this will except to do your duty as a lawyer? A. No, sir; I never knew any of the parties; never saw them that I remember of.

" 'Q. Did you read this will to him after it was written? A. Yes, sir.'

"The will was then read in evidence over the objection of the contestant. It is as follows: " 'The State of Texas, County of Galveston.

" 'Know all men by these presents, that I, Louis Fullhas, of the county of Galveston, state of Texas, being in good health, and of sound and disposing memory, do make and publish this, my last will and testament, hereby revoking all wills by me at any time heretofore made.

" 'First. I direct that all my just debts shall be paid, and that legacies hereinafter given shall after payment of my debts, be made out of my estate.

" 'Second. I give and bequeath to Irma Berlin the small house at 1412 13th St. in the city and county of Galveston, state of Texas. Also all oil stocks to go and become the property of said Irma Berlin, my grandniece.

" 'Third. I give and bequeath to my niece, Jennie Berlin, 1227 M ½ in the city and county of Galveston, Texas, to use and enjoy same until my grandniece becomes of age, paying the taxes and any and all improvements and at the time that Irma Berlin becomes of age said property to become the property in fee simple to my grandniece Irma Berlin to be her own separate property.

" 'Fourth. Any and all residue of my property, personal, real or mixed shall become the property of Irma Berlin to be her own property.

" 'Fifth. I hereby constitute and appoint my niece, Jennie Berlin, executrix of this, my last will and testament, and direct that no bond or other security be required of her as executrix.

" 'Sixth. It is my will that no other action shall be had in the county court in this administration of my estate than to prove and record this will and to return an inventory and appraisement of my estate and list of claims.

" 'In testimony whereof I have hereunto set my hand this the 22d day of April, A. D. 1919.

his
" 'Louis X Fullhas.
mark

" 'Signed, declared and published by Louis Fullhas, as his last will and testament, in the presence of us, and attesting witnesses, who have hereto subscribed our names in the presence of said Louis Fullhas at his special instance and request, this 22d day of April, A. D. 1919. Miss Julia Lee,
" 'Miss Thelma Jones.

" 'Filed May 2, 1919, Geo. F. Burgess, Clerk Co. Ct. Galveston Co., Texas.'

"I find all the facts testified to by the wit-

nesses as above recited to be true. And I find all the facts testified to by other witnesses, contradicting or contravening such statements, to be untrue; and such inferences, if any, as might be drawn from facts so testified by such other witnesses adverse to or inconsistent with the evidence so recited I find to be erroneous and misleading.

"There was no evidence of collusion of any kind between Mrs. Berlin and Dr. Hoecker and Mr. Patton; none was in fact charged in the petition for certiorari, the pleading of the contestant on which the case was tried. Nor was any such conspiracy or collusion expressly charged in the argument of the case before the trial court. Without such conspiracy it is impossible to maintain the charge of undue influence.

"It has been proved to the satisfaction of the court, and I so find:

"(1) That the testator was over 21 years old when he made the will, unmarried, and of sound mind, and that he is dead.

"(2) That the testator executed the will with the formalities and solemnities and under the circumstances required by law to make a valid will.

"(3) That the will was signed by the testator by making his mark, Mr. Patton, the attorney, assisting him in holding the pen by his direction and in his presence, and the same was attested by two credible witnesses, over the age of 14 years, subscribing their names thereto in the presence of the testator, and at his request, after he had stated to them that it was his will.

"Law.

"Decree probating the will follows as matter of law.

"Plaintiff, Mrs. Ottilia Bendig, contestant, excepts to the finding of the court.

"Street, Judge."

[1] Through the first three assignments appellant attacks these conclusions, claiming that Fullhas was shown not to be at the time physically or mentally able to execute a valid will, but to be in such weakened condition as to be unable to resist the proponent, Jennie Berlin, and that the will as probated was hers and not his. A careful review of the statement of facts convinces this court that the contention cannot be sustained; on the contrary, it adopts as its own the copied findings of the court below.

No respects in which these findings are even against the weight of the evidence are pointed out by the contestant. She wholly fails to show that the testator was at the time incapable of understanding the nature of the business in which he was engaged, or that his free agency was in any wise destroyed, or even that there was any active influence on the part of the beneficiaries in inducing the execution of the will; opportunity to exert influence is all that appears. A case of undue influence within the meaning of the law is therefore not made out. Trezevant v. Rains (Sup.) 19 S. W. 568; In re Burns' Estate, Patterson v. Lamb, 21 Tex. Civ. App. 512, 52 S. W. 99; Salinas et al. v. Garcia et al., 135 S. W. 588; Simon v. Middleton, 51 Tex. Civ. App. 531, 112 S. W. 443; Rounds v. Coleman, 189 S. W. 1090; Barry v. Graciette, 71 S. W. 311; Vaughan v. Malone et al., 211 S. W. 293.

[2] By a further assignment it is claimed the will was not proved by the subscribing witnesses, as required by law, in that they did not by written affidavit taken in open court and subscribed by them testify to facts sufficient to probate it; that until that had first been done the rule prescribed by article 3267 of our Revised Statutes had not been satisfied, and the due execution of the will become one of fact to be tried like any other. The point is not well taken; the statute does not purport to lay down an exclusive method, but merely a permissive one, reading, in so far as applicable, as follows:

"A written will produced in court may be proved:

"1. By the written affidavit of one of the subscribing witnesses thereto, taken in open court and subscribed by such witness."

It has been a number of times held that this and the three succeeding provisions do not forbid the introduction of other than the statutory proof. Hopf v. State, 72 Tex. 281, 286, 10 S. W. 589; Elwell v. U. S. Convention, 76 Tex. 514, 521, 13 S. W. 552; Stephenson v. Stephenson, 6 Tex. Civ. App. 529, 25 S. W. 649, 650.

The transcript before us here in two separate places contains the written affidavits of both the subscribing witnesses in this instance, Misses Julia Lee and Thelma Jones, taken in open court, and subscribed and sworn to by them; moreover, both these young ladies were present in person at the trial in the court below, and testified to the execution of the will with all the solemnities prescribed by law. It is true they did not state a positive opinion that the testator was of sound mind, but, taken in connection with what they did so testify to, there was abundant evidence otherwise produced to sustain the court's finding upon that question.

The judgment is affirmed.

Affirmed.