## BELL v. BELL et al.
### No. 6094.

Court of Civil Appeals of Texas.
Amarillo.

Jan. 8, 1951.

Rehearing Denied Feb. 12, 1951.

Carter & Gallagher, Dallas, for appellant.

G. H. Kelsoe, Jr., Dallas, for appellees.

LUMPKIN, Justice.

On November 13, 1946, Lee Bell executed a will in which he bequeathed all of his property to his wife, Catherine Bell. On December 24, 1947, Lee Bell died. This case is a contest over the validity of the will of Lee Bell, deceased. It originated when the appellant, Mrs. Catherine Bell, filed in the county court of Dallas County an application to probate the will, which was contested by the appellees, Walter A. Bell, Mrs. Jimmie Bailey, joined by her husband, and Mrs. Georgia Baker, joined by her husband. Bell, Mrs. Bailey and Mrs. Baker are the children of Lee Bell and the stepchildren of the appellant. The county court admitted the will to probate, and from this judgment of the county court the appellees appealed to the district court.

Trial in the district court was to a jury. The sole question involved was whether the deceased, Lee Bell, possessed the testamentary capacity necessary for the making of a valid will. In answer to a single special issue, the jury determined that the deceased did not possess testamentary capacity at the time of the execution of the instrument dated November 13, 1946. Upon this verdict the court rendered judgment for the appellees, and to this judgment the appellant duly excepted and has perfected her appeal to the Dallas Court of Civil Appeals whence it was transferred to this court by order of the Supreme Court of Texas.

The appellant contends that the finding of the jury to the effect that the testator at the time of the execution of the will was of unsound mind is contrary to the great weight and preponderance of the credible testimony.

The appellant and Lee Bell, the testator, were married on September 3, 1935. Shortly thereafter Mr. and Mrs. Bell entered into the cafe business and later they bought a small grocery store and meat market located in Dallas County. They operated the store together and lived in a house adjacent to the store. The appellant has operated this store since her husband's death.

On November 7, 1946, the deceased became ill. He was examined by Dr. H. C. Hodges, who discovered that Bell had a large edematous, or swelling, in the right leg. Soon after he became ill, the deceased instructed C. P. Smith, the appellant's son-in-law, to have a will written bequeathing all his property to the appellant. The will was written and delivered to the appellant. On November 13, 1946, Bell executed the will containing only two provisions: first, he bequeathed all of his property to his wife; second, he appointed the appellant as independent executrix of his will and estate and directed that no bond be required of her. He directed that no action be had in the probate court with reference to his estate, other than the probating of the will and the return of the statutory inventory. The record does not state the exact age of the deceased at the time he signed the purported will. However, it does reveal that he had grown children and it may be inferred from the entire record that he was an elderly man. Bell recovered from his illness in 1946 and returned to work in the store. In the fall of 1947 he became ill again and remained in bed until December 24, 1947, the date of his death. According to Dr. Hodges, Bell's death was due to a blood clot in the coronary arteries; his death was the result of an entirely different illness from that which he had suffered in the fall of 1946.

In the case of Green v. Dickson, Tex.Civ.App., 208 S.W.2d 119, 124, the law governing the issue of mental incapacity is stated as follows:

"It is the right of every citizen of this State to dispose of his property by will as he may desire, regardless of the ties of nature or relationship.

"It is the established rule that, in determining whether an aged testator has sufficient mental capacity to make a valid will, the court should be controlled by testator's acts connected with the execution of the will, the reasonableness of its provisions, and his ability to detail the nature and extent of his property and to know the objects of his bounty.

" 'The test is not whether the person who has made testamentary disposition of his property was of a high order of intelligence, but the humbler test is applied. Did he know what he was doing with the property which he knew he owned when he executed his will, and did he perform the act of his own free volition, and because he desired to do so?' Salinas v. Garcia, Tex.Civ.App., 135 S.W. 588, '590.

"A testator may be old and infirm, weakened in energy and impaired in his senses, but, if he responds to the test which is applied to human beings in the ordinary affairs of life, the disposition of his property will be respected. 'It is not for juries nor courts to say how property should be passed by will. They can do no more than see that the testator's mentality meets the law's tests.' Whitney v. Murrie, Tex. Civ.App., 264 S.W. 270, 274.

"It was held in the case of Vaughan v. Malone, Tex.Civ.App., 211 S.W. 292, writ dismissed, that, while contestants' witnesses testified that testatrix had a weak mind, was eccentric, and had some childlike ways, these conditions were not sufficient to justify annulling her will; that it was sufficient if she knew that the transaction in which she was engaged was the making of a will that conveyed her property at her death, and that she remembered the objects of her bounty, and acted without improper influences. Citing the cases of Brown v. Mitchell, 75 Tex. 9, 12 S.W. 606; Salinas v. Garcia, Tex.Civ.App., 135 S.W. 588; Milner v. Sims, Tex.Civ.App., 171 S. W. 784.

"In the case of Milner v. Sims, Tex.Civ. App., 171 S.W. 784, it was held that the fact that testatrix was old and feeble, that her memory had become faulty and her mental faculties somewhat impaired, was

not sufficient to warrant a court in setting aside her deed or will; that the right of a grantor to dispose of her property according to her own wishes was just as sacred, and should be guarded with as much care, as any rights due to the living."

In the case of Stell v. Salters, Tex.Civ. App., 83 S.W.2d 742, 743, the court said:

"The tendency of juries to set aside wills which exclude blood relatives from participation in the distribution of the estate of the testator is well known to the bench and bar. Huffnagle v. Pauley (Mo. Sup.) 219 S.W. 373; McCannon v. McCannon, Tex.Civ.App., 2 S.W.2d 942.

"Juries, in such cases, are disposed to think they are better qualified than the testator to make a proper disposition of the estate and make findings accordingly.

"In this case the will operated to divert the bulk of Finley's estate from Finley's blood relatives to those of Mrs. Finley. A man or woman in this state has the absolute right to dispose of their property by will as they see fit. Stolle v. Kanetzky, Tex.Civ.App., 220 S.W. 557. Such right is not to be defeated by adverse findings of juries upon the issue of testamentary capacity based upon evidence which does not fairly support such findings. * * *

"Numerous nonexpert witnesses for contestee testified the testator was of sound mind. A number of witnesses testified in behalf of contestants to trivial matters. No delusions or any peculiarities were shown from which mental unsoundness could be reasonably inferred. Contestants' witnesses, Frank Farmer, Ed. Buford and wife, testified that in their opinion Finley was of unsound mind, but the facts upon which they based such conclusions were, in our opinion, wholly insufficient to support the same. There was also evidence that Finley suffered from a physical ailment, but there is nothing to suggest it affected his mind.

"The entire evidence in this case has been examined carefully and the conclusion reached that the adverse finding upon the issue of testamentary capacity is so contrary to the great weight of the evidence

as to be clearly wrong, manifestly unjust, and should be set aside."

██ The proponent of a will has the burden of making out a prima facie case of the sanity of a testator at the time he executed the will. There is no presumption, as there is in the case of the makers of deeds and contracts, that the maker of a will was sane at the time he executed it. However, the state of mind of the testator as to sanity at times other than when he executed the will has no probative force except as it may tend to show the testator's state of mind at the time he executed the will. Navarro v. Garcia, Tex.Civ.App., 172 S.W. 723, 724; Kutchinsky v. Zillion, Tex.Civ.App., 183 S.W.2d 237, 239, writ refused.

A search of the statement of facts reveals that no witnesses testified that Lee Bell was of unsound mind on the morning of November 13, 1946, at the time he executed his will. Several witnesses for the appellees saw the testator at intervals during his illness in 1946, and at such times he appeared to be asleep, unconscious or in a stupor. As a rule they had no conversations with him. These visits occurred in the evening. It is true that J. B. Walker, the deceased's brother, assisted in caring for him. According to his testimony, he was in the Bell home from 3:30 in the afternoon until 9 the following morning every day from November 7 to November 25. He stated that whenever he went into the sick room, Bell did not recognize him, and during this time had no conversations with anyone. He stated further that Bell had his eyes closed and appeared to be resting and relaxed and that from November 7 to about November 17 he didn't know what he was doing.

The evidence shows that other than the testator, three persons were present at the time the will was executed: the appellant, J. E. Gray and Mrs. C. T. Owens. The witness Gray testified that he had lived near Mr. and Mrs. Bell for about ten years; that he had traded with them and had seen Bell at least once or twice each day from the time he opened the store un-

til he died. Gray said that at the time Bell executed the will, he was sitting up in bed with pillows behind his back. Mrs. Bell and Mrs. Owens were also there. When Gray saw Mrs. Bell in the store that morning, she asked him to witness the signing of the will. When he went into the bedroom Bell called him by name. Gray's testimony continues:

"Q. What conversation did you have with Mr. Bell when you went back there? A. I asked Mr. Bell—he spoke to me when I went in and called me by name, and when they got ready to sign the will I asked Mr. Bell did he know what he was signing, and he said 'yes.'

"Q. Did Mr. Bell sign this will which is marked Defendant's Exhibit 1, in your presence? A. Mr. Bell did."

Gray said that he did not stay in Bell's bedroom over 15 or 20 minutes but that he talked to him about his condition and asked him how he was getting along and Bell said he was getting better. He stated that Bell recovered from his illness and returned to work in the store and worked for several months. During those months Gray saw Bell at least six times a week. Gray's testimony continued:

"Q. Tell the jury what you observed with reference to the mental faculties or mental alertness of Mr. Bell at the time you witnessed the will? A. Well, he was all right as far as I could see. He knew me and talked to me, and he bent over from the back of his pillow-straightened up and signed his will, and he talked with as good sense as anybody, with as clear a mind as anybody.

"Q. Did you see any difference in his mental condition that morning from what it had been before he became ill? A. No. * * *

"Q. Did he appear to be the same from the standpoint of his mental faculties at the time you signed the will, as he had the three or four years you knew him? A. Well, he was a sick man and he wasn't alert or nothing like that, but seemed to be in sound mind, just as sound as he ever was, for that matter."

Mrs. C. T. Owens stated that she lived in a rent house owned by the Bells and located next door to their residence. She stated that during his illness in 1946 she saw the deceased at least once a day. She stated that at the time the will was executed the testator was sitting up in bed. She said she spoke to Bell and asked him how he felt and that his conversation was normal. Her testimony continues:

"Q. What are the facts with reference to whether or not he appeared to have his full mental capacity? * * * A. Before we signed the will Mr. Gray asked him a question, he wanted to know if he knew what he was doing, and he said 'yes, I do, it's all right.'"

Mrs. Owens testified that the testator was of sound mind at the time he executed the will.

Dr. H. C. Hodges stated that he first saw Bell on November 7, 1946. Upon examination of the testator in his home, the doctor found that he had a large edematous, or swelling, in the right leg. This condition was painful. The doctor administered a grain of codeine to relieve the pain. He prescribed two tablets, each containing one-fourth grain of phenobarbital, three times a day. This dosage was continued for two days; thereafter, the testator received one tablet three times a day. This dosage continued until December 15, 1946. He said that this was not a large dose and that it was given for the purpose of relaxing the nervous system. The doctor's testimony continues:

"Q. When you saw Mr. Bell on November 7th, what was his condition with reference to his mental faculties? A. He was apprehensive but perfectly clear mentally.

"Q. Did he have full possession of all of his mental faculties? A. Yes, he did."

He said that he visited Bell again on November 11th; that he talked in a perfectly normal manner and carried on an intelligent conversation; and that he was perfectly competent and had full possession of all his mental faculties, although he was suffering pain in his right leg. He gave

Bell one-fourth grain of morphine sulphate. This made him groggy for three or four hours. The doctor said he visited the testator a number of times from November 11 to November 28, that he saw him on November 12, that on November 17 and 28 he again administered a narcotic, and that on each occasion his patient was perfectly clear mentally. His testimony continues:

"Q. Did he have the mental capacity at all times from the time he became ill on November 7th up until the time you saw him in your office on December 15th, did he have the mental capacity on all of those occasions to know who his relatives were? A. Surely.

"Q. Did he have the mental capacity to know what property he had? A. Yes sir.

"Q. Did he have the mental capacity on all of those occasions to know who was close to him and who he owed an obligation and duty to? * * * A. Yes sir. * * *

"Q. Doctor, in his 1946 illness that Mr. Bell had was he ever in a coma? A. No, sir."

In several respects this case is similar to that of In re Bartels' Estate, Tex.Civ.App., 164 S.W. 859. In that case the attesting witnesses testified that the deceased was of sound mind at the time the will was executed. Other witnesses testified similarly while witnesses for the contestants stated that the deceased was of unsound mind. The evidence showed that the testatrix died of Bright's disease from which she had suffered for several years prior to her death. She had been troubled with swelling of her lower limbs. Both of the appellees testified that her physical condition affected her mind, and that, as the disease progressed, her mental condition became worse. These witnesses expressed the opinion that she was not of sound mind for three or four years prior to her death. One of the witnesses testified that the deceased told her she intended to leave her property equally to the children. The will did not do this. The jury found that the deceased did not have sufficient capacity to make a will. The Court of Civil Appeals held this finding to be against the overwhelming weight and preponderance of the evidence and reversed the judgment and remanded the cause.

In this case the attending physician testified that the testator was mentally normal on November 12, the day before the date of the will, and that he was perfectly sane and normal several days after the making of the will. The attending witnesses testified that he was competent when he signed the will. No one testified as to any insane delusions or any acts on the part of the testator which would indicate mental incapacity at the time the will was dated nor do the contents of the will so indicate. Generally, the appellees' witnesses base their opinion as to the unsoundness of Lee Bell's mind on the ground that he was asleep or in a stupor at the times they visited him. It is undisputed that rest and quiet had been prescribed for him. His physician had ordered that he not be disturbed. One of the witnesses, Mrs. Betty Walker Peterson, the deceased's sister, testified she visited her brother on several occasions during his illness in 1946. She said that he appeared sleepy or unconscious and did not recognize her and that on one occasion he called her "Daught" which was the nickname used by the deceased for Mrs. Peterson's sister.

This slip of the deceased's memory, under the circumstances, would not be the test of his competency or capacity to execute his will. In the case of McCannon v. McCannon, Tex.Civ.App., 2 S.W.2d 942, 944, the court said: "Imperfect memory, caused by sickness or old age, forgetfulness of the names of persons a testator has known, idle questions or statements, or requiring a repetition of information, will not be sufficient to establish incompetency, if he has sufficient intelligence remaining to understand the act he was performing, the property he possessed, the disposition he was making thereof, and the persons or objects of his bounty".

Although the testator in this case did not read the will in the presence of the witnesses, he indicated that he understood its contents. Under all the facts and

circumstances we believe the deceased was cognizant of the property he possessed, recognized the objects of his bounty and understood the act he was performing. He was possessed of a small estate, all of which had been acquired since he married the appellant. It was but normal and natural for him to bequeath to his wife his share of their small store and their residence. There is nothing in this record which tends to show that the deceased was not acting with a clear and competent mind at the time he executed his will on November 13, 1946. In our opinion the finding of the jury that the deceased did not have sufficient capacity to make a will is so against the great preponderance of the evidence that we are unwilling to let it stand. Navarro v. Garcia, Tex.Civ.App., 172 S.W. 723, 724; In re Fowler's Estate, Tex.Civ. App., 87 S.W.2d 896.

Therefore, for the reasons stated, the judgment of the trial court is reversed and the cause remanded for another trial. Because of our disposition of the case, it will not be necessary to discuss the appellant's other points of error.