JOWERS et al. v. SMITH et al.

No. 6108.

Court of Civil Appeals of Texas. Amarillo.
Oct. 23, 1950.

Rehearing Denied Nov. 20, 1950.

Hackney & Crewford, Brownfield, for appellants.

Crenshaw, Dupree & Milam, Lubbock, and McGowan & McGowan, Brownfield, for appellees.

PITTS, Chief Justice.

This is a will contest seeking to nullify a former judgment of the County Court of Terry County admitting to probate the will of W. J. Smith, deceased, and declaring both the former judgment and the will invalid for lack of mental capacity of the testator to execute the will and because of the exercise of undue influence upon the testator by his son Andrew Q. Smith. The testator was 88 years of age at the time of his death on April 27, 1948, in Terry County, Texas, and his estate consisted of about 400 acres of land together with some personal property. There were thirteen children born to him and his first wife who died in 1936, two of the children died in infancy and another preceded the testator in death leaving a son surviving her. Thereafter in September of 1938 the testator married Callie Smith, who, together with ten of the children by his first marriage and the son of his deceased daughter, survived him.

The record reveals that the will in question was executed on February 1, 1943, and testator bequeathed two milch cows and their calves and a life estate to the surface rights of a quarter section of land to his surviving wife, Callie Smith, with the remainder of the said land together with the mineral rights therein to his son, Andrew Q. Smith. To his other nine children and his grandson he bequeathed

$1.00 each. All the rest of his property he bequeathed to his son Andrew Q. Smith whom he likewise named as independent executor.

Upon the application of Andrew Q. Smith the will was admitted to probate on May 17, 1948. Thereafter on January 3, 1949, four of the surviving children of testator, namely: Eugene Smith, Mrs. Ella Jowers, Mrs. Monterey Cogburn, and Mrs. Ethel Bristow, each joined by her husband, and Mrs. Callie Smith, the surviving wife of the testator, filed this suit in the County Court of Terry County against the other six surviving children of testator, namely: Andrew Q. Smith, Frank Smith, Mrs. Cornelia Goode and husband, Mrs. Isabel Colwell and husband, Mrs. Neuma Skaines and husband, Mrs. Dillie Fitzgerald and husband, and the surviving grandson of the testator, Willard Helmer, seeking to set aside the will for the reasons previously herein stated. The defendants denied generally the allegations of contestants, after which the defendants, Mrs. Goode, Mrs. Skaines, Frank Smith and Willard Helmer, each filed a separate answer denying plaintiffs' allegations and alleging that the testator was of sound mind and memory when he executed the will in question and that the same was executed by him of his own free will and without having been influenced or persuaded so to do by any other person.

On July 20, 1949, the Judge of the Terry County Court heard the contest and denied contestants any recovery, upholding the validity of the will and the former judgment admitting it to probate. Contestants perfected their appeal to the District Court where a trial was had before a jury. At the conclusion of the evidence offered by the contestants the trial court instructed a verdict against them and rendered judgment accordingly upholding the validity of the will from which judgment an appeal has been perfected. The contestants will be hereafter referred to as appellants and the defendants as appellees.

 It must be remembered that this is not an appeal from an original proceeding admitting the will to probate, but this is an attack made upon the validity of a will that had already been admitted to probate without a contest and a final judgment so entered. The proponents who offered the will for probate originally assumed the burden of complying with all legal formalities and of establishing the necessary prerequisites for its validity. These matters were heard and determined by the probate court in the original proceedings and every presumption must now be indulged in favor of the validity of the will. The rule always obtains that testamentary incapacity will never be presumed as to the testator of a will duly probated and the burden rests upon those who seek on such grounds to set aside a will duly probated and show, if they can, such testamentary incapacity. Those who seek in a new suit to set aside a will that has already been admitted to probate on the grounds of testamentary incapacity or undue influence, or both, have the burden of establishing such charges by a preponderance of the evidence. Cook v. Denike, Tex. Civ.App., 216 S.W. 437; Barton v. Bailey, Tex.Civ.App., 202 S.W.2d 277, and other authorities cited in these cases. The latter case cited further holds that the real test in a case such as this for determining the testator's mental capacity for making a will is whether or not he knew at the time what property he owned, the objects of his bounty and understood the general effect of his will.

In the case at bar only lay witnesses testified and only two of them testified that the testator was of unsound mind and they are the daughters of appellant Callie Smith and were the stepdaughters of the testator. A brief summary of the testimony given by the witnesses is here stated.

(1) J. A. Parks testified that he had been a neighbor of testator and had known him thirty years before his death; that he visited with him on one occasion and talked with him about the sale of some nice white-faced cattle early in February of 1943 (about the time the will was executed); that on that occasion testator said "I won't sell you anything because I don't know what is going on". But he and testator went out and looked at the

cattle and testator told him Andrew would have to pass on the matter before he would sell them; that Andrew looked after testator's business and he (witness) said no more about buying the cattle but had a friendly visit with testator as usual; that the witness further testified in response to questions propounded by appellants' counsel as follows:

"Q. Mr. Parks, did you notice any marked change in him from back when you first knew him up until 1943? A. Oh, yes, I notice that on everybody; that is, I do on me.

"Q. Did you notice a marked change in the old gentleman? A. Yes, sir."

(2) B. M. Wade testified that he had known testator since 1916; that he had visited him quite often and was at his bedside when he passed away; that he at the request of testator had witnessed the will in question.

(3) O. F. Campbell testified that he had known testator since 1939 when witness had worked testator's land and had business dealings with him and that testator was in poor health at that time; that he saw testator after he had worked his land and testator seemed to be getting weaker.

(4) Nancy Rounsaville testified that she knew testator during his lifetime and had visited in his home but not since 1936; that she met him on the street in Brownfield in 1943 and he did not know her; that she told him who she was and talked with him for some time, asking about the family and his health, which apparently was bad; he looked sick and apparently had been for some time.

(5) L. B. Alexander and his wife both testified that they had known testator since about the middle of 1944 after which time they visited him in his home four or five times each year; that he was sick and in bed about half the time and seemed feeble; that he did not know them sometimes and they had to tell him who they were.

(6) Appellant Eugene Smith testified that he was testator's oldest son; that his mother, testator's first wife, died in 1936 and he further testified as to other members of the family but he gave no material facts concerning the issues of mental incapacity or undue influence.

(7) Appellant Mrs. Callie Smith testified that she was 76 years of age and the surviving widow of testator. She further testified that from 1940 until testator died in 1948 Andrew Q. Smith leased and worked testator's land and was in and about the home premises often, during which time he ate his meals with her and his father. She was later recalled and testified about giving the will in question to Andrew Q. Smith once before testator died and he returned the will to her later in the same day and that she gave the will to Andrew again after testator died. She was asked no questions about the testator's mental condition during his lifetime and therefore gave no testimony concerning such.

(8) Mrs. Goldie Killingsworth testified that she was the daughter of Mrs. Callie Smith by a former marriage and the stepdaughter of testator; that she had known him since 1938 when he and her mother married; that during the years 1939, 1940, 1941 and a part of 1942 she visited in their home quite often, stayed in their home some and drove the car for them but after 1942 she only visited in their home; that during the time she was associated with testator he had cataracts on his eyes which affected his vision and that he was a sick man, very feeble, "off-minded" and she drove for him to visit the doctors; that she further observed that he would be writing letters and noticed that his mind was getting off and it bothered him because his mind was leaving him and he knew it, he couldn't figure like he used to, he thought people were stealing from his premises, thought his wife was a prowler in the house one night and nearly shot her, his children would drive up and he would go to the door and ask "who is that?" The witness further testified that testator often thought someone was stealing something and he locked the house at night; that he was not able to work and attend to his own business and Andrew attended to most of his business; that he said "he knew his health was failing him" and he would get

mad at himself about it. The witness was recalled next day and testified under direct examination and over appellees' objections as follows:

"Q. Mrs. Killingsworth, from your association and observation of the acts and conduct of W. J. Smith over the period of time that you were associated with him, what is your opinion as to whether or not he was of sound or unsound mind on the first day of February, 1943? A. Well, I could just tell that Mr. Smith's mind wasn't good by him just writing out there and he couldn't get things together and he could get mad at—(interruption)

"Q. Well, don't go over that again. We went over that yesterday. What I asked you was—I wish you would read that last question again.

(Under the direction of the court the same question was read to the witness by the court reporter) when the witness replied:

"A. I wasn't with him after '42 only to visit. But I could tell that his mind was getting weaker and he was also getting weaker because he had—
(She was again interrupted by appellants' counsel with the following remarks)

"You still haven't answered my question. What is your opinion as to whether he was of sound mind or unsound mind on February 1, 1943? You haven't answered that question."

After counsel for appellees had objected and the same was overruled, the witness said:

"A. I will say that he wasn't able minded of taking care of his business".

Appellants' counsel again said:

"Well, don't—I asked you whether or not he was of sound mind or unsound mind."

The witness then said:

'He was unsound mind".

(9) Mrs. Mae Scott testified that she was the daughter of Mrs. Callie Smith and the stepdaughter of testator and had known him since 1941; that her husband worked for Andrew Smith during the year 1942 and she and her husband lived on testator's farm where she saw testator often; that

testator was all right at first but his mind grew weaker and he was not well for several years; that he did not transact any business but left that for Andrew to do. She further testified that testator would put things away and then accuse someone of stealing them, lock himself in the house and imagine people were trying to rob him, write letters and not have confidence in himself about what he was writing, try to figure and then say he did not have mind to do it, did not always remember what he had previously said; that he thought her mother was a prowler in the house one night and got the gun after her; that he did not recognize some of his children sometimes when they came in the house; that his mind would "go and come" but she further testified that he knew what was going on around the place most of the time. Based upon her association and observation of the testator as related, the witness further testified over the objections of opposing counsel that in her opinion testator was of unsound mind.

All of the foregoing witnesses were offered by appellants and a careful examination of the testimony reveals that no attempt was made to lay a predicate for inquiring of the disinterested witnesses who had known testator the longest about his mental incapacity. The only witnesses testifying concerning testator's mental incapacity were the two daughters of appellant Mrs. Callie Smith who is seeking to nullify and set aside the will, and it could hardly be said that these two witnesses were wholly disinterested. One of them gave her opinion very reluctantly.

The law governing the issue of mental incapacity for executing a will has been well stated in the recent case of Green v. Dickson, Tex.Civ.App., 208 S.W. 2d 119, 124, as follows:

"(1) It is the right of every citizen of this State to dispose of his property by will as he may desire, regardless of the ties of nature or relationship.

"(2) It is the established rule that, in determining whether an aged testator has sufficient mental capacity to make a valid will, the court should be controlled by tes-

tator's acts connected with the execution of the will, the reasonableness of its provisions, and his ability to detail the nature and extent of his property and to know the objects of his bounty.

"(3) 'The test is not whether the person who has made testamentary disposition of his property was of a high order of intelligence, but the humbler test is applied, Did he know what he was doing with the property which he knew he owned when he executed his will, and did he perform the act of his own free volition, and because he desired to do so?' Salinas v. Garcia, Tex.Civ.App., 135 S.W. 588, 590.

"(4) A testator may be old and infirm, weakened in energy and impaired in his senses, but, if he responds to the test which is applied to human beings in the ordinary affairs of life, the disposition of his property will be respected. 'It is not for juries nor courts to say how property should be passed by will. They can do no more than see that the testator's mentality meets the law's tests.' Whitney v. Murrie, Tex.Civ. App., 264 S.W. 270, 274.

"It was held in the case of Vaughn [Vaughan] v. Malone, Tex.Civ.App., 211 S.W. 292, writ dismissed, that, while contestants' witnesses testified that testatrix had a weak mind, was eccentric, and had some childlike ways, these conditions were not sufficient to justify annulling her will; that it was sufficient if she knew that the transaction in which she was engaged was the making of a will that conveyed her property at her death, and that she remembered the objects of her bounty, and acted without improper influences. Citing the cases of Brown v. Mitchell, 75 Tex. 9, 12 S.W. 606; Salinas v. Garcia, Tex. Civ.App., 135 S.W. 588; Milner v. Sims, Tex.Civ.App., 171 S.W. 784.

"In the case of Milner v. Sims, Tex.Civ. App., 171 S.W. 784, it was held that the fact that testatrix was old and feeble, that her memory had become faulty and her mental faculties somewhat impaired, was not sufficient to warrant a court in setting aside her deed or will; that the right of a grantor to dispose of her property according to her own wishes was just as

sacred, and should be guarded with as much care, as any rights due to the living."

We are aware of the fact that this case is before us on an instructed verdict, upon the assumption by the trial court, as a matter of law, that all of the evidence introduced, if true, did not present an issue for the jury on the question of testamentary incapacity of the testator. We are likewise acquainted with the rule of law to the effect that lack of testamentary capacity may be proved by the opinions of non expert witnesses, based upon their observations or knowledge of the habits, conduct, expressions, peculiarities, disposition, temper or character of the testator, and who have had sufficient opportunity to acquire such knowledge, and after stating the facts of their own knowledge upon which they based their opinions. King v. King, Tex.Civ.App., 91 S.W.2d 511; 44 Tex.Jr. 583, paragraph 41, and other authorities there cited. The rule is well established that the facts and circumstances on which an opinion with respect to mental soundness of testator is based must be relevant and reasonably tend to show mental unsoundness. Whether evidence is relevant and admissible is a question of law to be determined in each case by the trial court, and the test of its admissibility to prove any particular fact is whether or not it is capable of affording any reasonable presumption or inference as to the matter in dispute and the rulings of the trial judge in that regard will not be disturbed, in the absence of a showing of abuse of discretion. 17 Tex.Jur. 348, paragraph 114; 336 paragraph 105; 19 Tex.Jur., page 135, paragraph 92; 3 Tex. Jur. 1079, paragraph 760; 1 Tex.Jur.Supp. 1937, 310 Section 760; 22 C.J. 607–609, paragraph 700, 701; 32 C.J.S., Evidence, § 507, and numerous authorities cited by these texts.

The case of Rudersdorf v. Bowers, Tex. Civ.App., 112 S.W.2d 784, writ dismissed, is a very similar case to the one at bar. The court there held that some delusional trend in the mind of an aged testator had no bearing on his testamentary capacity and affirmed the trial court's judgment based upon an instructed verdict. In that

case the appellate court also held it is the rule ordinarily that less mental capacity is required to enable a testator to make a will than for him to make a contract.

The testimony in this case shows that the testator was uneducated, old, sick, had a bad memory, possibly eccentric and he was partially blind because of cataracts on his eyes, but the test is not whether he was educated or not, sick or well, had a strong or weak mind, but the question to be determined is whether or not he had testamentary capacity under the rules of law announced by our courts in such cases.

Appellants offered the testimony of six disinterested witnesses who testified they had known testator intimately a long time before his death. Some of them visited him during his last illness which was five years after he had executed the will in question. None of these witnesses expressed an opinion as to whether or not the testator had testamentary capacity. Testator's oldest son and his surviving wife testified but they gave no material facts concerning his mental capacity. Appellants sought to prove testator's mental incapacity only by the daughters of Mrs. Callie Smith. It is our opinion that the facts upon which the said two daughters based their opinions to the effect that the testator was of unsound mind were insufficient to support their conclusions expressed and their opinions so expressed are therefore without probative value. Under the record and rules of law governing the facts here presented, it must be presumed that the will was properly executed and that the testator had mental capacity until the contrary is established by a preponderance of the evidence. There is no showing in the record here that the testator did not know what he was doing with the property he owned when he executed the will. He named and provided for each of his surviving children, his surviving wife and his surviving grandson in the will. He described his property in the will. He must have known what he was doing with his property and must have known the objects of his bounty. Such being true, appellants have failed, as a matter of law, to raise an issue of testamentary incapac-

ity by evidence of probative force. In support of our conclusion we cite another similar case to the one at bar in which an instructed verdict was given by the trial court and a writ refused, n. r. e. Bass v. Bass, Tex.Civ.App., 207 S.W.2d 103.

Appellants further contend that the evidence taken as a whole was sufficient to raise an issue of undue influence. They concede there is no direct evidence in the record showing that Andrew Q. Smith was present when testator executed his will but they rely upon circumstantial evidence to support the charge of undue influence. It has been held that the issue of undue influence can be established by circumstantial evidence alone but such evidence must have sufficient probative force to raise the issue and the burden of proof in a case such as this rests upon the contestants to establish the necessary facts by a preponderance of the evidence.

A summary of the evidence heretofore set out will not be here repeated. In addition to that previously herein stated, appellants offered further testimony tending to show that testator leased his land to Andrew Q. Smith for a period of eight years at a rental value of $1.00 per acre when there was evidence to the effect that the rental value of the said land was $3.50 or $4.00 per acre. However, appellants also established the fact that there was no set rental price for such land in this country and a rental price of such land over a period of eight or nine years would be approximately $2.50 per acre.

In the case of Burgess v. Sylvester, Tex. Civ.App., 177 S.W.2d 271, 275, affirmed 143 Tex. 25, 182 S.W.2d 358, this court held that:

"Undue influence must be exercised at the time of making the will, and the will must result therefrom. Rounds v. Coleman, Tex.Civ.App., 189 S.W. 1086; Cloudt v. Hutcherson, Tex.Civ.App., 175 S.W.2d 643, 653.

"(6) A will cannot be set aside on proof of facts which at most do no more than show an opportunity to exercise undue influence which may have existed or raise a bare suspicion that such influence may

have been used. Rounds v. Coleman, supra, and authorities cited, page 1090 of 189 S.W. See, also, Cameron v. Houston Land & Trust Co., Tex.Civ.App., 175 S.W. 2d 468, 470, and authorities there cited."

In the case of Pullen v. Russ, 209 S.W. 2d 630, this court held that an opportunity to exert an influence over the testator, together with testator's advanced age, his impaired physical condition and the fact that he preferred one of his children over the others, taken alone would not necessarily be evidence of undue influence. This court there likewise held that undue influence must be of such a nature as to destroy the free agency of the testator and cause him to do something that he would not have otherwise done. We there further held that although a testator was under the general and even controlling influence of another person in the conduct of his business, such alone will not suffice to invalidate a will on the ground of undue influence. In such cases evidence must be offered of acts that have a tendency to subvert and overthrow the will of a testator and cause him to execute a will containing provisions that he did not intend to include in his will.

An examination of the record in the case at bar reveals that appellants proved by the witness B. M. Wade that he was present and witnessed the will in question but they did not attempt to prove by him who else was present. There is no evidence of probative force, either direct or circumstantial, tending to show that Andrew Q. Smith was present when testator executed his will or that he exercised any influence whatever over W. J. Smith in the execution of his will. We also cite Barton v. Bailey, supra, and Cadena v. Cadena, Tex. Civ.App., 223 S.W.2d 678, in support of our holding.

■■■■ Appellants complain that the trial court erred in refusing to permit the testimony of their witnesses to the effect that testator's mind was weak without first laying a predicate therefor and contend that such testimony was material on the issue of undue influence. The two witnesses named in appellants' discussion of the complaint here made are Mr. and Mrs. L. B. Alexander, both of whom testified that they did not know the testator until the middle of 1944, which was a year and a half after the will in question had been executed. Their testimony concerned their observations and associations with the testator long after the will had been executed and their opinions about his mental condition then would not have been material. The record does not disclose what their opinions would have been had they been expressed. For these reasons appellants have not shown injury in the matter. But, be that as it may, under authorities previously herein cited, the rule has been well stated that lay witnesses may express an opinion as to the mental condition of a testator at the time of the act in question based upon their observations and knowledge of his habits, conduct, peculiarities, disposition, and other characteristics. In spite of appellants' failure to show otherwise the materiality of any testimony the witnesses might have given, it is our opinion that the trial court did not commit error in refusing to admit the testimony of the said witnesses without a proper predicate having been laid for it and appellants' point to the contrary is overruled.

■■■■ Appellants complain that the trial court erred in its refusal to hear testimony concerning the execution of some other will by testator and that the will in question was not executed in 1943 but was executed in 1945. These complaints are not supported by appellants' pleadings. In their pleadings they mentioned no will other than the one executed by the testator on February 1, 1943, a full copy of which is attached to their pleadings and made a part thereof. They asked that it be nullified, cancelled and held for naught on the sole grounds of testamentary incapacity and undue influence. The complaints here made about the matters not raised in their pleadings are overruled.

A careful examination of the record and of the assignments of error presented by appellants reveal no reversible error. The judgment of the trial court is therefore affirmed.