Robert **OLIVER** et al., Appellants,

v.

Ethel **WILLIAMS** et al., Appellees.

No. 33.

Court of Civil Appeals of Texas.

Corpus Christi.

Aug. 20, 1964.

Rehearing Denied Sept. 10, 1964.

704

W. S. Fly, of Fly, Cory & Moeller, Victoria, for appellants.

James A. Hunt and Pat Kelly of Hunt, Cullen, Mallette, Maddin & Edwards, Victoria, for appellees.

NYE, Justice.

This case involves a Will contest on the testamentary capacity of the testator. The County Court of Victoria County on September 18, 1962, entered judgment after a contest of the Will was heard admitting the Will to probate. An appeal was perfected to the District Court and a jury in that court on the 13th day of June, 1963, found that the testator had testamentary capacity at the time he executed the Will. The trial court entered his judgment from this verdict on July 2, 1963, and contestants' amended motion for new trial was overruled on the 21st day of August, 1963. Appeal was then perfected to the Court of Civil Appeals of the Fourth Supreme Judicial District of Texas and, by order of the Supreme Court, assigned to this Court for hearing.

The testator was John P. Oliver, a bachelor. The Will was dated and signed, valid in form, on October 21, 1960, witnessed by two witnesses. Mr. Oliver died April 26, 1962. Ethel Williams, niece of the testator, and her twelve-year old son were the sole beneficiaries.

Lottie Burg, Robert Oliver and Jessie Oliver, sister and two brothers of the testator, were contestants in the probate court; and Lottie Burg later having died, her heirs, Joe Burg, Patti Lee Gerbert, joined pro forma by her husband Gene Gerbert, Allen Sloan, Oliver Sloan and Jack Sloan, were substituted for such decedent contestant and, hereinafter, all of such contestants will be referred to as appellants.

After application to probate the Will was filed, J. S. Williams, named in the Will as Independent Executor, died. His widow, the said Ethel Williams, before the trial was held in the District Court, was named as administratrix c. t. a. Ethel Williams, individually, as administratrix and as legal guardian of her minor son, thereafter acted as proponents of the Will, hereinafter referred to as appellees.

The sole special issue submitted to the jury was "Do you find from a preponderance of the evidence that the said John P. Oliver had testamentary capacity at the time he signed the said instrument introduced as the Will of said John P. Oliver?" To this special issue, the jury returned answer "Yes" as their verdict.

Motions for instructed verdict by both the appellants and appellees were overruled as likewise was appellants' motion for judgment non obstante veredicto. The appellants then perfected their appeal to this court.

Appellants' first points are (1) no evidence; (2) insufficient evidence to sustain the issue of testamentary capacity; and the trial court's failure to grant: (3) appellants' motion for instructed verdict, and (4) appellants' motion for judgment non obstante veredicto. These points of error

will be discussed together inasmuch as they relate to the sufficiency of evidence.

■ The question of insufficient evidence requires the Court of Civil Appeals to consider and weigh all of the evidence supporting the verdict, along with the other evidence in the case, including that which is contrary to the verdict. In Re King's Estate, 150 Tex. 662, 244 S.W.2d 660 (1951); Fisher Construction Company v. Riggs, 160 Tex. 23, 325 S.W.2d 126 (1959).

The testator, John P. Oliver, lived on a farm near Victoria, Texas, on some property he inherited from his family. He was uneducated and lived most of his life by himself. The testator had several brothers and sisters one he was particularly fond of by the name of Andrew Oliver. A true kindred spirit of brotherly love developed between the testator and this brother. This brother, Andrew Oliver, had several children, one of whom was a daughter, Ethel Williams, who was a co-beneficiary under the Will, along with her son, a minor. The testator could write his own name but was unable to read or write otherwise. This favored brother, Andrew, co-signed his checks until the time of Andrew's death. Later on the testator designated Andrew Oliver's daughter, Ethel Williams, to co-sign the checks with him. The Will was executed some fifteen months prior to his death. There was no evidence of undue influence nor any special issue requested on this point by the contestants, the appellants herein. Several months before the testator's death, he moved into town and lived with Mrs. Williams and her family. She took care of him until his death in April, 1962.

There were many witnesses for both the contestants and for the proponents of the Will. Appellants' witnesses all testified that in their opinion the testator did not have the ability to understand the nature and extent of his property, nor did he have the ability to conduct a business transaction. Without attempting to detail all of their

testimony, the pertinent summary of each, in addition to the above, was as follows:

Appellants' first witness, Ann Oliver, wife of one of the contestants, testified that she had known the testator for fifty years, that he was not able to conduct a normal conversation.

The second witness called by the appellants was R. B. Magee, who had known the testator since 1911 and had employed him to work for him in his gin. He stated that he had employed him off and on for fifteen years and that he did mostly roustabout jobs about his gin, watching the feed house, keeping the feed pushed back and sometimes running the "sucker". He stated when he was asked the question "Was he able to count bales?" "Well, that didn't come under his job. I never risked him at that." He testified that he did not believe that the testator had the ability to comprehend and understand business transactions. On cross examination he admitted that the only business transaction that he had ever had to do with the testator was employing him and paying him for his services. He never did buy or sell anything to the testator.

Witness William Castillo, for the appellants, testified that he had known the testator for many years, that he had tried to lease the testator's land, which the testator said was ten acres (the proof showed that it was 330 acres). Appellants' attorney questioned him:

"Q. Did he tell you how much land he had?

"A. Yes, sir, at first I had understood that he had more land than what it came out to be when he talked to me. Somebody told me he had more land to lease so I came by to the place to deal with him and he said he only had ten acres right by the house where he was living so I forgot it.

"Q. Did I understand you to say he told you ten acres was all the land he owned?

"A. Yes, sir, that was what he told me all the land he owned."

Castillo testified further that the testator told him that he had sold his land for $10,000.00 (the proof showed it was sold for approximately $50,000.00, but the proof also showed that the testator received $9500.00 cash and a note for the balance).

Felix Gonzales, who had known the testator for many years, had the same opinion of testator.

Witness Selzer testified that he stopped and visited with the testator one morning and asked him about his pick-up truck and stated that the testator did not give him any satisfactory answer about the price that he had paid for the pick-up. The witness admitted testator had been going to church all during his lifetime and after the testator had moved to town he had been going to church fairly regularly (a different denomination from Ethel Williams, the beneficiary, with whom he was living).

Witness John Lolla testified that he went with the testator on a trip to Marlin, Texas, and that the testator told him that he was afraid he could not find his way home from Marlin. He further testified that the testator said that he had received $70,000.00 for his property when in fact he received approximately $50,000.00.

Witness Bianchi stated that the testator told him he was selling his hens because he had roosters which could lay eggs, that testator was unable to say how many acres of land he had and that he had received $300.00 per acre for his land, which was twice as much as he had actually received.

Witness Joe Ann Martin testified that testator told her that it took all the money he had to buy the new car, when it was undisputed that he received $9500.00 cash from the sale of his farm, and he had only paid $2100.00 for the car.

Proponents likewise produced a number of witnesses, two of whom were witnesses to the execution of the Will. Mr. Law-

rence Stange, Assistant Vice President of the Victoria Bank & Trust Co., testified that he was a friend of the Oliver family for a number of years, that he had known the testator first, as a young fellow growing up, through his family who operated a grocery store. He testified that the testator expressed the desire that he be a witness to the Will, that the Will had been explained to the testator and that he had executed it; that he had witnessed the Will in the presence of the testator and in the presence of witness Janda, and that the pertinent high points of the Will were explained to the testator. Appellees called Laddie Janda, the other witness to the Will, who was Assistant Cashier at the Victoria Bank & Trust Co. Mr. Janda testified that the Will was explained to the testator and that he expressed the desire to execute the Will and that the testator had signed the Will in his presence and in the presence of Mr. Stange. He testified that the testator executed it of his own free will and accord as if he was willingly and happy to do it.

The next witness called was Mrs. Jimmy Lattimore, who had known the testator about twenty years. She stated that she and her husband operated a drug store and that they had done his prescription work. She testified that she had talked with him many times about his prescriptions, and that he was always able to tell her what the doctor said was wrong with him; that the testator would come back for re-fills. She stated that she had had many other conversations with him and that the conversations were that of a normal human being. She testified that he knew the members of his family, his sisters and brothers, and that he spoke of them from time to time. Testator knew of his property and talked to her about his farm. In response to a question if the testator ever mentioned what he wanted to do with his estate, the witness answered:

"Before he sold his land, he told us Mrs. Williams was very kind to him. She came out to the farm and did things for him and would bring him into her home and that if he did have anything he would like for Mrs. Williams to have what he had left."

Again, the witness testified, in response to the question as to whether he ever mentioned the disposition of his estate after he sold the farm, she answered:

"A. Yes. One time he was in the store, he was in there many times, but this particular time he asked us to go out and see his new car. And we did. And he said, I want to enjoy my money, but, you know, I want to let Ethel and her family the money because they were very kind to me and I love them.

"Q. These times he would come to the store he was by himself?
"A. Yes, sir."

Witness Fossati testified that the testator patronized his place of business and he had known the testator for a long time. He stated that the testator knew his brothers and sisters and members of his family and spoke of them; that the testator not only spoke English, but also spoke the Spanish language well; that he knew the testator in September and October of 1960 and that he patronized his place of business then and was a normal customer like anyone else. He testified that the testator was a person who could make up his own mind and that his memory was very good.

Mr. G. H. Schroeder, officer of the First Victoria National Bank, testified that the testator had purchased a perpetual care certificate through him from the Evergreen Endowment Association for the Oliver family; that he had appeared all right in his presence and that he knew what he was doing and appeared to be normal when he paid for the certificate.

A Mr. Bronson Maulch testified that the testator had purchased a new car from him in 1960; that he did the usual hasseling and horse trading, and drove a pretty hard bargain when he purchased the car; that

he picked out the car he wanted and the color; that this sale was the same month that the testator executed his Will; that he signed his name to the application for certificate of title; that based on witness's experiences of previous car sales and other car deals, he knew that the testator knew what he was doing when he signed the application for title; that the testator came back to his place of business on two occasions subsequently for servicing of the car.

Witness Zatopec had known the testator approximately four years prior to his death. He testified that he saw the testator occasionally in church and that, although the testator had been trading at another store, he was able to strike up an acquaintance and by the exercise of good service and salesmanship had been able to get the testator to start trading with him; that he was prompt in paying his bills and that whenever he had four or five tickets he would always come and pay them by check counter-signed by Mrs. Williams.

Mrs. Dorothy Bohn, a housewife and neighbor of Mrs. Williams, stated that she knew the testator because they visited back and forth and had coffee and occasionally had family barbecue together on Sunday. She testified that he was treated as a member of the family; that he could definitely tell his favorite television programs and when they were coming on; that they had little family jokes; that he was a happy person; that he drove his car by himself and came and went as he wished. She was then questioned:

"Q. Based on your experience around the home and hearing him talk and discuss the matters with the family, do you have an opinion as to whether he knew he had the mental capacity to transact business?

"A. I think he definitely did.

"Q. Based on your observations and discussions with him and visiting in there from time to time, do you have an opinion as whether or not he had a memory to remember transactions and matters that may have come on days ago, weeks ago or months ago?

"A. Yes.

"Q. Do you have an opinion?

"A. Yes.

"Q. Was that memory good or bad?

"A. I think he remembered about like all of us. Ball games and discussing it for one thing."

In submitting the issue to the jury, the trial court gave the following instruction:

"By testamentary capacity is meant that the person at the time of the execution of the will has sufficient mental ability to understand the business in which he is engaged, the effect of his act in making the will, and the general nature and extent of his property. He must also be able to know his next of kin and the natural objects of his bounty. He must have memory sufficient to collect in his mind the elements of the business to be transacted and to hold them long enough to perceive at least their obvious relation to each other, and to be able to form a reasonable judgment as to them."

The testimony in this case shows that the testator was uneducated and in declining years. He lived alone most of his life and was probably eccentric. He was not required to hold steady employment because of his worth and his station in life. As a bachelor he did not enjoy the companionship of a wife and children. But he was a happy man, not burdened with the worries of the world; mindful of the general nature and extent of his property and the natural objects of his bounty; and he was possessed with sufficient mental ability to understand the business in which he was engaged, though limited when compared with the complexity of this modern business world.

The test is not whether the person who has made testamentary disposition of his property possesses a high order of intelligence. Jowers v. Smith, 237 S.W.2d 805 (Tex.Civ.App.1950). The lack of education or proof of illiteracy has little, if any, bearing on the mental capacity to make a will. 94 C.J.S. Wills § 16, p. 706. Here we are concerned with the sufficiency of the evidence concerning the testamentary capacity of the testator as the able trial judge has defined it. Such definition is correct. Welch v. Shoubrouek, 260 S.W.2d 84 (Tex. Civ.App.1953); Morris v. Morris, 279 S.W. 806 (Tex.Com.App., opinion adopted by Sup.Ct.1926).

We have read the entire statement of facts in this case and we are satisfied that the evidence is sufficient to support the jury's findings of testamentary capacity. Jowers v. Smith, supra. In re Finkelstein's Estate, 61 S.W.2d 590 (Tex.Civ.App.1933, Writ. Dism.); Barton v. Bailey, 202 S.W. 2d 277 (Tex.Civ.App.1947, Wr.Ref.). Appellants' points 1 through 4 are overruled.

Appellants' fifth and sixth points of error complain of the trial court's ruling in admitting certain testimony of witnesses Fossati and Maulch as to their opinions or conclusions and the trial court's ruling on some non-responsive answers. The witnesses were non-expert witnesses who had demonstrated that they knew the testator and, through their acquaintance, they had a reasonable opportunity to observe his acts, his conduct, and his characteristics sufficiently to support an opinion or conclusion about the matter. As such, these opinions and conclusions expressed, constituted competent evidence. See In re: Hardwick's Estate, 278 S.W.2d 258 (Tex.Civ.App.1954, Wr.Ref. n. r. e.) and the many cases cited therein. Even a ten minute acquaintance with a testator was sufficient for a witness to express an opinion as to his sanity. Mueller v. Banks, 273 S.W.2d 88 (Tex.Civ. App.1954, Wr.Ref. n. r. e.); Ross v. State, 153 Tex.Cr. 312, 220 S.W.2d 137 (1948).

The weight to be given such evidence was of course a matter for jury determination. However, some inadmissible testimony was also received, but nothing has been pointed out which demonstrates that the receipt of such evidence probably caused the entry of an improper judgment in this case. Rule 503, Texas Rules of Civil Procedure; Hernandez v. Heldenfels, 374 S.W.2d 196 (Sup. Ct.1963).

The mere fact that the answer is not responsive is not of itself ground for a reversal or, for that matter, for its exclusion. Is it not true that many contested trials with numerous witnesses elicit occasionally, non-responsive answers? Here the answers complained of did not contain facts that were not clearly inadmissible for other reasons. Therefore, if there was error, it was harmless. See McCormick & Ray, Vol. I, § 582, p. 400.

Appellants' seventh and eighth points complain of sidebar remarks by counsel for appellees and that the attorney constantly asked improper questions in an attempt to prejudice the jury and influence their minds against the appellants. We overrule these points.

Such testimony, to quote it all, would extend this opinion too long. It is sufficient to say that this was a hotly contested case, tried by able counsel for both the contestants and proponents. We have carefully examined the record as a whole and, after doing so, are unable to say that such alleged errors were reasonably calculated to cause, and probably did cause, the rendition of an improper judgment by influencing the jury to return a verdict that they probably would otherwise have not returned. Rule 434, T.R.C.P.; Lehmann v. Krahl, 155 Tex. 270, 285 S.W.2d 179, and the cases cited therein.

Finding no reversible error, the judgment of the trial court is affirmed.

Affirmed.